**Elvis E. DALRYMPLE, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 35392.**

Court of Criminal Appeals of Texas.

Feb. 27, 1963.

Rehearing Denied April 17, 1963.

mitted to the jury which resulted in their verdict of guilty and the assessment of thirty years' confinement in the State penitentiary as punishment.

The State's principal or star witness was an accomplice by the name of Herman Talley. Almost one-half of the statement of facts reflects the testimony of this witness, Talley.

The careful trial judge fully charged the jury upon the testimony of an accomplice, pursuant to Article 718, Vernon's Ann. C.C.P., which provides:

"A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense."

Appellant's primary contention is that the State failed to corroborate the testimony of the accomplice witness sufficiently to sustain the verdict.

In studying the record to determine the sufficiency of the corroborating evidence, we are guided by the statement made by Presiding Judge Hawkins in the case of Story v. State, 153 Tex.Cr.R. 541, 221 S.W.2d 917, wherein he stated:

"The test as to the sufficiency of the corroboration, long recognized as correct by our court, is to eliminate from consideration the evidence of the accomplice witness, and then examine the evidence of the other witnesses with the view to ascertain if there be inculpatory evidence, that is, evidence of incriminating character which tends to connect the defendant with the commission of the offense. If there is, the corroboration is sufficient, otherwise it is not."

Viewing the evidence in this light, we shall narrate from the testimony of various State's witnesses in order to determine if it tends to inculpate the appellant with the

---

James H. Martin, Dallas, for appellant.

Alton R. Griffin, Dist. Atty., Lubbock, James R. Edwards, Asst. Dist. Atty., Lubbock, and Leon B. Douglas, State's Atty., of Austin, for the State.

McDONALD, Judge.

Appellant was charged under a five count indictment with the offense of murder, the fifth count charging commission of the offense "by some means unknown to the Grand Jury." This was the count sub

commission of the offense. The first witness for the State, other than the accomplice, Talley, was Mrs. Charlie Biggs, who testified that she operated the Joy Motel at 814–34th Street in Lubbock. Mrs. Biggs testified that she rented Cabin No. 20 to two men on January 18, 1962, for a week, one of whom identified himself as J. L. Carpenter, and she identified one of them as the appellant. She related that she later took the license number, NC 5580, down on the register sheet; that the automobile was an Olds 88, metallic green; that the two men had rented Cabin 20 on Thursday and that the last time she saw the automobile was on Saturday, the 20th; that it was dark and she could not recognize the man that she saw but she noticed the car. The witness further related that she went out to Cabin No. 20 the next morning, Sunday, and saw the door had been kicked in and the lock lying over in the middle of the room and a bedspread, blanket, a pillow case and three towels missing. Mrs. Biggs stated that the occupants did not return and ask for any of their money back and that she had not seen the appellant since then until she "came to court here today."

The guest register from the motel was introduced by the State. It reflects that a J. L. Carpenter registered on 1/18 and the car license column of the register contained the number NC 5580 on the same line to the right of J. L. Carpenter's name.

Richard Tivis was the next State witness. His testimony reflects that he was the owner and operator of the Rendezvous Club; that he knew the appellant and saw him at his club on the night of January 20, 1962, with a boy and a girl; that the girl was June Dalrymple; that he saw Herman Talley "setting at the table with them" (the appellant and this other man and this woman) part of the time; that he did not know the deceased—"I didn't · recognize him by the picture that was in the paper" —that he had no acquaintance with him whatsoever.

Juanette Cheek next testified for the State, relating that she was cashier at the Rendezvous Club on Saturday night of January 20, 1962; that she saw J. R. Castle (the decedent); that he came into the club around 12:00 and that she did not charge him full price because it was so late; that she did not see him leave and she did not know who he left with.

Horace Cook was the next State witness. Mr. Cook testified that he worked at Paymaster Cotton Oil; that he was working the night shift from 12:00 at night until 8:00 in the morning, the Saturday night of January 20 and the early morning hours of the 21st of January; that Herman Talley and another man came up and asked him to take them to get some gas, "they'd run out of gas"; that he did not know this other man but Herman introduced him as Jim Ed; that this was between 2:00 and 4:00; that he got the company pickup and took them to a service station and got the gas and then went back out on Loop 289 to the car; that it was a '54, '5 or '6 model Oldsmobile but he didn't pay much attention to it, but it was white over green, turquoise or blue, "it was foggy that night"; that the gas was put in the car and that "there was two people setting in the car"; that he did not know them, "all I seen was the back of their heads"; that "it was one male and one female"; that he did not see where the car went after he had put the gas in it and the car started; that he returned to the oil mill. This witness related that he was familiar with that area and that there is a caliche pit near there, just to the right of the car, "it starts just, oh, in 50 yards of where they was parked, and it runs a good 300 yards from there."

The State's next witness, Paul Kirk, testified that he was a plumber; that on the morning of January 21, 1962, he was out at the caliche pit to do some target practice at about one o'clock in the afternoon; that he discovered the body of the deceased; that it was clothed as follows: "Oh, it had on one sock, I believe, and underwear. and

a sweat shirt," the sweat shirt was red; that he saw no one else around the caliche pit; that he called the police and then awaited their arrival.

Patrolman Howard Hall of the Lubbock police department testified for the State, relating that he went to the caliche pit the afternoon of January 21 and met Paul Kirk there and remained there until an ambulance came; that he examined the "person there in that pit" and that he "later ascertained the name of the man—whose body that was" and that his name was J. R. Castle.

Dr. Richard Kepler, a State witness, testified that he was a pathologist; that he had examined the body and gave his opinion as to the cause of death. The doctor testified that he removed two pieces of metal from the right femur; that he also took a specimen of blood from the body and that he turned the blood over to the Department of Public Safety and turned the two pieces of metal over to the "law officials who were present there." It was the doctor's opinion that "Mr. Castle basically died of shock due to multiple traumatic injuries," that the "abrasions and contusions about the face were contributory factors." He further testified: "I believe exposure is a contributory factor. I believe the wound involving the femur of the leg that was fractured, from the foreign materials of the bullets is a contributory factor. I believe the entrance wound of the abdomen with the bleeding within the abdominal cavity was likewise a contributory factor. None of these things individually and of themselves would necessarily be a total cause of death, but all together in summation of the working together was the total cause of death."

State's witness Raymond Waters, Captain of Company C, Texas Rangers, testified that as part of his investigation into the death of J. R. Castle on January 21, 1962, he went to Denver, Colorado, and there examined an automobile; that it was a 1957 Oldsmobile sedan, "green or dark green car or blue, more of a green, I believe"; that the license number was NC 5580, Texas license plate, '61; that he made a search of the automobile and found various articles in it; that the "windshield had a crack or a shattered place on the right-hand—close to the right-hand side of the windshield and it was splattered—and a pretty good spot there"; that the force that had shattered this place on the windshield had come from the inside; that he found a shirt in the trunk of the automobile. The shirt was admitted into evidence as a State's exhibit. It bore a white tape with lettering on it, "E Dalylple". The witness further testified that he found a bullet just under the front mat on the right-hand side in the floorboard of the car; that he examined the front and back seats of the automobile and saw stains on the seats. The witness was allowed to testify without objection: "Yes, sir, there was blood stain on the front and back seat and I believe some on the back of the front seat," in response to an inquiry: "Were there quite a few stains all over the seats, Captain?" Captain Waters related that he took the seats out of the automobile and brought them to Lubbock with him and turned them over to Wayne Anderson, shown to be a chemist for the Department of Public Safety, and he turned the bullet over to the ballistics department of the crime laboratory in Austin, Texas.

Witness Roger Sedberry next testified for the State, relating that he was firearms examiner for the Texas Department of Public Safety and that his office or laboratory was in Austin. After detailing his educational background and experience, the witness told of the procedure in identifying bullets as having been fired from a particular gun. He then testified that State's Exhibit No. 2 (shown to have been the bullet removed from the body of the deceased) and State's Exhibit No. 4 (shown to have been the bullet removed by Captain Waters from the floor mat of the Oldsmobile), the two bullets, in his opinion, "were fired from the same particular gun."

Major L. D. Blakely, Assistant Chief of Police of the City of Lubbock, next testified for the State. He stated that he had made a search of an area just off of the Old Slaton Highway on Loop 289 as part of his investigation of the death of J. R. Castle; that he found a sport jacket or coat; that it was gray, "I would say more medium," rather than light or dark; that the jacket had some stains on it, "probably as large as a dime"; that the stains were dark and it appeared that they had been put on the jacket in the form of droplets.

Ken Castle, the son of the deceased, testified as a State's witness. He related that his father had a jacket, and he described it as being a zipper type jacket, waist length, elastic bottom. When asked if he had seen the jacket lately that belonged to his father, the witness stated that he had seen and examined a jacket shown him by the District Attorney, and to the best of his ability he would say that it belonged to his father.

Jack Bryant, deputy sheriff of Lubbock County, testified as a State's witness. He related that he went to Denver, Colorado, on March 15, 1962, and took custody of Elvis Dalrymple, the appellant, and brought him from the City-County Jail in Denver, Colorado, to the Lubbock County Jail.

Mrs. A. B. Barsh testified as a State's witness that she was foreman of the grand jury and that an indictment of murder with malice was returned against one Elvis E. Dalrymple; that the grand jury was not able to determine by what means J. R. Castle was killed and for that reason an indictment was returned stating that J. R. Castle had been killed by means unknown.

Mrs. J. R. Castle testified for the State and related that she was the widow of the deceased; that she last saw him alive on Saturday morning, January 20, about 7:30.

Wayne Anderson testified as a State's witness, relating that he had until "not quite a month ago" been a chemist and toxicologist for the Texas Department of Public Safety at the regional office in Lubbock for four years; that he was presently a sales representative. The witness then narrated his educational training and qualifications and testified to receiving a short type heavy jacket from the Lubbock Police Department; that the jacket had blood on it; that he ran a blood type and the blood on the jacket was "Type A"; that Captain Raymond Waters delivered two car seats, a front seat and a back seat of an automobile, to him; that there were stains on the seats; that he analyzed them and they were human blood stains; that the blood type from the rear seat was "Type A"; that the blood type from the front seat was "Type A"; that the blood typed was human blood from both seats; that he received from Dr. Kepler a blood sample taken from the body of J. R. Castle; that he made a blood type on that blood sample and it was "Type A"; that he made an alcoholic test for blood alcohol content on the blood sample given him by Dr. Kepler; that "the blood contained 1.500% alcohol by weight." Mr. Anderson testified that the incidence of Type A blood is probably 40% over the United States.

It was agreed and stipulated by and between the State and the appellant that the following people are now charged by indictment with the offense of murder, or accessory to murder, or accomplice, in the matter of the death of J. R. Castle: Mary Virginia Grizzell is indicted as an accessory to murder; Ida Jo Whitten is indicted as an accessory to murder; June Dalrymple is indicted for murder; Jim Edward Hammonds is indicted in two counts, the first count being murder, and the second count being an accessory to murder, and the appellant, Elvis E. Dalrymple, being indicted for murder, and that these four persons are indicted for this offense growing out of the same death.

Although appellant adduced testimony from several witnesses, we shall only relate the testimony of one of them, Billy Don Dalrymple. He testified that he is a brother of the appellant; that he had seen "an Olds-

mobile car, '57 Oldsmobile car at his home before, say, sometime in January of 1961"; that he drove this car and that the seats in this car had dark stains on them. The witness did not relate who owned the car.

■ In its brief the State points out correctly that the corroborating evidence does not have to be sufficient of itself to establish the appellant's guilt and that the corroborating evidence need not extend to every part or element of the offense committed, but that the State need only corroborate its accomplice witness by other testimony which in some degree tends to connect the accused with the crime alleged. It is the position of the State that it has developed a chain of circumstantial evidence which was drawn from direct testimony about physical facts and reasonably led to the conclusion that the appellant committed the offense charged. It is the State's position that this circumstantial evidence was sufficiently strong and as competent as positive evidence to prove the ultimate fact that the appellant did commit the acts charged in the indictment. The State relates in its brief that the "record has established that the defendant and his party, shortly after the commission of the crime charged, left Lubbock, Texas, and drove to Denver, Colorado. This flight so soon after the crime is a circumstance to be considered in connecting the defendant with the crime charged." We do not find in the record any testimony to substantiate this contention of the State, other than that of the accomplice, Talley. Captain Waters testified that he conducted an investigation and that as part of it he had an occasion to go to Denver, Colorado, but he did not give any date as to his trip to Denver. State's witness, Jack Bryant, did testify that he went to Denver on March 15, 1962, and took custody of the appellant. The record reflects that the offense was committed on or about January 21, 1962. We do not think that the State's testimony is sufficient to establish "flight" as a circumstance to be considered in connecting the appellant with the crime charged.

The State urges in its brief, which it followed pretty closely in its oral argument, that it corroborated the testimony of the accomplice witness, Herman Talley, when the appellant "was placed in possession of the green Oldsmobile automobile two (2) days prior to the date of the crime, and also placed in possession of the automobile between 8:00 p. m. and 9:00 p. m. the night of January 20, 1962." The State contends in its brief that this "evidence was adduced from Mrs. Charles Biggs when she testified that she had rented a motel room to the defendant January 18, 1962, that he was driving a green Oldsmobile, license number NC 5580." We have carefully again gone over the testimony of Mrs. Biggs and at no place in it do we find any statement as to the driver of an automobile.

Recapitulating the evidence adduced by the State, and viewing it in the light most favorable to the State, it reflects that Mrs. Biggs placed the appellant as being at her motel when Cabin 20 was rented, but the deceased was not present. Richard Tivis saw appellant in his night club, but the deceased was not present, but Juanette Cheek's testimony does reveal the presence of the decedent at the Rendezvous Club operated by Tivis. The testimony of Horace Cook does not in anywise implicate the appellant other than to show the presence of an Oldsmobile automobile near the caliche pit. The ownership of the automobile was never shown by any testimony. The appellant nor the decedent were neither shown to have been present at the time that Cook delivered the gasoline for Talley. An unknown male and female were in the car at the time the gas was put in the tank. The State did establish that the two bullets, one from Castle's body, and the other from the floorboard of an Oldsmobile automobile, were fired from the same gun, but it did not produce the gun nor did it establish the ownership of the gun that fired the bullets, nor did it show by any testimony who fired the gun. Chemist Wayne Anderson did show that the jacket, two car seats and the body of the deceased, Castle, all con-

tained the same type blood, Type A, but Mr. Anderson also testified that 40% of the population of the United States had Type A blood and other than the specimen taken from the body of Mr. Castle, the record does not reflect the ownership of the blood samples found on the jacket or the two car seats, nor does it show who spilled the blood. The State views the evidence in its brief differently from our view, as reflected from the record. It is the State's contention that Texas Ranger Waters testified that "he went to Denver, Colorado, and examined a green Oldsmobile, License Number NC 5580 being the *same automobile that defendant was driving the night of the commission of the crime*." We find nothing in the testimony to support this contention of the State.

The accomplice witness, Herman Talley, related that he saw the appellant at the Rendezvous on January 20, 21, 1962, around 9:30 P.M. with his wife, June Dalrymple, and Jim Ed Hammonds. They sat with him at a table and drank beer. Talley testified that he saw the deceased, J. R. Castle, at the Rendezvous and that Castle left with June Dalrymple. Later, Talley left with the appellant and Hammonds and they all got in the Oldsmobile; that June and Castle were sitting on the front seat and that he and Hammonds got on the back seat and the appellant in the front seat; that he rode with them to the Malt Bar, where he and Hammonds got out and the three remaining occupants of the car drove off. Talley then related that he and Hammonds drank some coffee in the Malt Bar and then went to the Joy Motel, Cabin 20, where they waited for the appellant and June; that about 40 minutes later the appellant and June came in the cabin "with blood all over them" ; that appellant had a pistol about six inches long and that appellant said "they'd had to kill that man." The accomplice then related the details of accompanying the Dalrymples back to the caliche pit to find a shoe that June had lost; that he heard the man, Castle, hollering, and he told of the appellant asking for a knife, saying "he would

cut the man's throat," and that he also quoted the appellant as having left the car and returned within a few minutes, saying that "he killed the man with a rock." Witness Talley then related the trip by the motel to pick up two girls and the subsequent trip by the six of them to New Mexico and on to Denver. Talley's testimony is replete with numerous references to his criminal record, but it would add nothing to this opinion to dwell further on his testimony. We find nothing in the record to corroborate Talley's testimony.

 From what we have said, it is our opinion that the evidence adduced by the State is insufficient to corroborate the accomplice testimony.

For that reason, the judgment is reversed and the cause remanded.

Rehearing denied; WOODLEY, P. J., dissents.