Lilla PAULUS, Appellant,

v.

The STATE of Texas, Appellee.

No. 57536.

Court of Criminal Appeals of Texas, Panel No. 1.

Oct. 28, 1981.

Motion for Rehearing May 26, 1982.

Mike DeGeurin, Dick DeGuerin, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty., Carol S. Vance, Former Dist. Atty., William W. Burge, Robert Bennett, and Timothy G. Taft, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

Before ONION, P. J., and ROBERTS and CLINTON, JJ.

## OPINION

CLINTON, Judge.

Appeal is taken from a conviction for the offense of accomplice to murder with malice aforethought under our former penal code.[1] Upon the jury's return of a verdict of guilt, the trial court assessed appellant's punishment at 35 years confinement.[2]

The indictment returned against appellant alleged,

"Bobby Wayne Vandiver and Marcia McKittrick on or about the 24th day of September, A.D. 1972, in said County and State did with malice aforethought kill John Hill by shooting him with a gun.

And the Grand Jurors aforesaid do further present in and to said court that *Lilla Paulus* on or about the 24th day of September, A.D., 1972, *prior to the commission of the said offense* by the said Bobby Wayne Vandiver and Marcia

McKittrick as aforesaid, in the County of Harris and State of Texas, *did unlawfully and willfully advise, command, and encourage* the said Bobby Wayne Vandiver and Marcia McKittrick *to commit said offense,* the said Lilla Paulus not being present at the commission of the said offense by the said Bobby Wayne Vandiver and Marcia McKittrick. . . ."

The sufficiency of the evidence is challenged.

Viewed in a light most favorable to the jury's verdict of guilt, the evidence reflects the first of a crucial sequence of events forming the context of this case to have been the death of Houston socialite and equestrienne Joan Robinson Hill in February of 1969. During Mrs. Hill's illness and immediately preceding her death, a long time friend, Dianne Settegest,[3] was a house guest in the Hill home in River Oaks. Eventually, suspicion regarding Joan Robinson Hill's death fell on her husband, Dr. John Hill, a prominent plastic surgeon. Among the witnesses who testified in May of 1970 before a Harris County grand jury in connection with the abstruse death was Dianne Settegest. During this trip to Houston, Settegest stayed with Ash Robinson and his wife, "Ma," the parents of the deceased woman, their only child.

John Hill was indicted for murdering his wife and brought to trial in January of 1971. During the trial, Dianne Settegest stayed with another close friend in Hous-

---

1. Article 1256, V.A.P.C. (1925) provided:

 "Whoever shall *voluntarily kill any person* within this State shall be guilty of murder. Murder shall be distinguished from every other species of homicide by the absence of circumstances which reduce the offense to negligent homicide or which excuse or justify the killing."

 Article 70 V.A.P.C. (1925) defined an accomplice to the crime as follows in part relevant to the instant case:

 "An accomplice is one who is not present at the commission of an offense, but who, *before the act* is done, *advises, commands or encourages* another to commit the offense. . . ."

(All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.)

2. Article 72, V.A.P.C. (1925) provided:

 "Accomplices shall, in all cases not otherwise expressly provided for, be *punished in the same manner as the principal offender.*"

 And, Article 1257, V.A.P.C. (1925):

 "The punishment for murder shall be death or confinement in the penitentiary for life or for any term of years not less than two."

3. Settegest testified she had met Joan Robinson, and her father, Ash, in Baton Rouge in 1952 at a horse show.

ton, Lilla Paulus,[4] our appellant, at the latter's home on Underwood Street, and appellant attended a portion of the trial when Settegest testified.

The prosecution of Dr. John Hill ended in a mistrial. A second trial was to commence in the late fall of 1972 and it was Settegest's assumption she would stay with appellant again at that time.

Marcia McKittrick testified that she met appellant in January, 1972, at "either the [Houston] airport or her home"—she didn't remember which, but believed it to be the airport—and on that day or the next, went to appellant's home on Underwood;[5] according to McKittrick, she thereafter stayed at appellant's home "many times," whenever she was in Houston from the time she met appellant until the time of completion of the offense alleged here. McKittrick, a prostitute by trade, "worked" while in Houston at the William Penn Hotel under the alias "Dusty." Appellant was aware of her profession and asked McKittrick not to bring her "men friends" to the house, with which request McKittrick complied.

At "some time" during McKittrick's stay with appellant, the latter asked McKittrick if she knew of anyone interested "in filling a contract," meaning a killing. McKittrick agreed to make inquiries. Thereafter, McKittrick met Ash Robinson at appellant's home and appellant later told her that Robinson was the one who wanted a contract filled on Dr. John Hill. McKittrick did not know who John Hill was. She testified that she thereafter saw Ash Robinson at appellant's house "several times."

In "the spring or early summer of 1972" on a trip to Dallas McKittrick mentioned the contract to her "chip,"[6] Bobby Vandiver, an admitted robber. Two weeks "or so" later, she introduced Vandiver to appel-

lant at the house on Underwood in Houston. According to McKittrick appellant asked Vandiver if he were interested in the "contract" for $5,000.00, and stated she would receive her money from the same unmentioned source as Vandiver. Vandiver agreed and they discussed details. Later McKittrick and Vandiver decided to "forget it" and returned to Dallas. Late in the summer, appellant called Vandiver at his sister's house in Dallas and told him the contract was on again and ". . . what had gone wrong was right again." McKittrick and Vandiver returned to Houston, and several weeks before September 24, 1972, appellant took them on at least three occasions to the Hill home on Kirby Drive in River Oaks, discussing Hill's routine and mentioning the people who were normally there. McKittrick also claimed that on occasion, she was with appellant when she met Ash Robinson at Ben Taub Hospital in Houston, but she stayed in appellant's car while appellant would sit in Robinson's car or they would walk. McKittrick, however, was not privy to any conversation, but on several occasions it appeared to her that Robinson handed money to appellant.

McKittrick further testified that prior to September 24, 1972, appellant told Vandiver the money was to come from Ash Robinson because Robinson was convinced that Hill would never be convicted of causing his daughter's death and that this was the only way he could get justice. Appellant gave McKittrick and Vandiver a coffin shaped picture of Hill. In an effort to locate Hill, McKittrick made phone calls from appellant's home with her knowledge to Seattle and to Las Vegas. Unable to locate Hill, McKittrick and Vandiver drove to Las Vegas in an effort to find him "a few days before" September 24th. Still unable to locate Hill, they returned to Houston where

---

**4.** According to Settegest, she had known appellant since 1957 or 1958, having met her at the Almeda Stables in Houston.

**5.** Appellant testified she first met McKittrick in the spring of 1972 when she accepted the invi-

tation of an old friend, Bill McDonald, to come for coffee one morning. McKittrick was also a guest of McDonald at the time.

**6.** Boyfriend.

appellant told them that Hill was to return the next day but that Ash Robinson did not know on which flight. Appellant informed McKittrick that Ash Robinson had given her $7,000.00.

On the morning of September 24, 1972, McKittrick saw Robinson at appellant's home and he stated that Hill would have $15,000.00 on his person. McKittrick testified appellant had the arrival times for the National Airlines flights from Las Vegas on that day, but she didn't know which flight Hill would be on; McKittrick called the ticket agent for National Airlines and learned Hill was due to arrive in Houston at 6:38 p. m. McKittrick related she and Vandiver then estimated the time it would take a taxi to come from the airport; at about 7:00 p. m. they drove to the Hill home.

Vandiver knocked on the door and entered the house; McKittrick drove the car to the House of Pies on Kirby Drive and waited for him to call on the pay phone as planned.

Inside the house on Kirby, Vandiver encountered the 12 year old son and mother of his intended victim. He bound and gagged these witnesses, then apparently thereafter masked himself[7] and waited for Dr. Hill's arrival. Hill and his wife, Connie, had just returned to Houston via National Airlines from a trip to Seattle, San Francisco and ultimately a medical convention in Las Vegas. At approximately 7:30 p. m., they arrived by taxi at their home.

Immediately the Hills confronted the masked Vandiver who announced "this is a robbery." Hill and Vandiver struggled and Connie Hill ran for help. Vandiver fled after fatally shooting Hill four times with a .38 caliber pistol supplied by McKittrick.

In the interim, McKittrick had waited an hour when Vandiver telephoned and said there had been a "rumble." She picked him up at a Stop and Go convenience store and they returned to appellant's home. There appellant gave Vandiver $5,000.00 and he returned $1,500.00—$1,000.00 for steering him to the job and $500.00 for the advance she had given to them for his and McKittrick's trip to Las Vegas.

McKittrick related she and Vandiver then left for Dallas where they learned from television news reports the pistol used had been recovered from some bushes near the Hill home.

Regarding the quantum of proof the State was obliged to adduce in the instant case, Article 38.14, V.A.C.C.P. directs:

"A conviction cannot be had upon the testimony of an accomplice[8] unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense."

In appellant's trial, the jury was correctly instructed that Marcia McKittrick was, as a matter of law, an accomplice witness. Thus, though the State may have estab-

7. The deceased's son, Robert Hill, later identified Vandiver from a photograph.

8. It is important to differentiate an "accomplice *to the crime*" [see Article 70, V.A.P.C., supra, iterated in n. 1, *ante*] from an "accomplice *witness*" within the meaning of Article 38.14, supra.

Under the former penal code, parties to offenses were denominated "principal," "accomplice" to the crime (accessory before the fact) and "accessory" (after the fact). Reference to an "accomplice *witness*," however, is a generic phrase meaning any person who *testifies*, and who either as a principal, accomplice or accessory to the crime, was instrumental in its commission, through an act or omission on his part which occurred either before, at the time of, or after its commission, irrespective of whether he was actually present at, or a participant in, the culminated offense. *Carnathan v. State*, 478 S.W.2d 490 (Tex.Cr.App.1972).

Thus, while under the former penal code, "principal," "accomplice" or "accessory" conduct constituted separate offenses, distinct from one another, *Dinklage v. State*, 135 Tex. Cr.R. 10, 117 S.W.2d 111 (1938); *Lopez v. State*, 170 Tex.Cr.R. 208, 339 S.W.2d 906 (1960), when any of these parties testified for the State in the trial of any of the others for their common offense, he would be an "accomplice *witness*" and his testimony subject to Article 38.14, supra.

lished every element of the offense alleged against appellant through the testimony of McKittrick, the law insists that unless there is evidence *independent* of her testimony which tends to connect appellant with the commission of that offense, the evidence as a whole must be deemed insufficient. Article 38.14, supra, *Walker v. State*, 615 S.W.2d 728 (Tex.Cr.App.1981).[9]

Because of both the nature of the offense charged against appellant—accomplice to murder—and the reliance by the State on "cumulative circumstances" to supply the corroboration of McKittrick's testimony regarding appellant's conduct and criminal liability, the instant case is uncommonly complex and will in time necessitate application of legal principles not always involved in reviewing the sufficiency of the corroboration of an accomplice witness. But the established yardstick against which all such evidence is to be broadly measured is as was first articulated in *Edwards v. State*, 427 S.W.2d 629, 632 (Tex.Cr.App. 1968):

> "The test as to the sufficiency of the corroboration is to *eliminate from consideration the evidence of the accomplice witness* and then to examine the evidence of other witnesses with the view to ascertain *if there be inculpatory evidence,* that is *evidence of incriminating character* which tends to connect the defendant

with the commission of the offense. If there is such evidence, the corroboration is sufficient; otherwise it is not." [Citations omitted.] [10]

This independent inculpatory evidence necessary for corroboration need not be direct, but may be circumstantial, for "[a]pparently insignificant circumstances sometimes afford most satisfactory ... corroboration of an accomplice's testimony." *Holmes v. State*, 70 Tex.Cr.R. 423, 157 S.W. 487, 493 (1913).[11] Thus, because the State is not obliged to adduce some isolated fact which within itself is sufficient corroboration, "[i]t is the combined and cumulative weight of the evidence furnished by nonaccomplice witnesses which supply the test." *Minor v. State*, 108 Tex.Cr.R. 1, 299 S.W. 422 (1927).[12]

This Court has held the Article 38.14, supra, requirement that the nonaccomplice witness evidence "tend[ ] to connect the defendant with the commission of the offense," does not mean the corroborative evidence must establish every material or criminative fact alleged against the accused; indeed, if it did, such would be tantamount to requiring that evidence to independently establish guilt, thus vitiating the value of accomplice witness testimony.[13] But as a corollary, it is equally well settled that it matters not the slightest how thorough the corroboration of the accomplice witness

---

**9.** In *Walker*, supra, at 731, the policy underlying this rationale was explicated as follows: "An accomplice witness is a discredited witness....

\* \* \* \* \* \*

It has frequently been said that the testimony of an accomplice witness is untrustworthy and that it should be received with caution. \* \* \* [T]he testimony of an accomplice witness is to be carefully scrutinized not only because of any interest he or she might have but because his testimony is evidence from [an admittedly] corrupt source." [Citations omitted.]

**10.** See also *Walker*, supra; *Nelson v. State*, 542 S.W.2d 175 (Tex.Cr.App.1976); *Etheredge v. State*, 542 S.W.2d 148 (Tex.Cr.App.1976); *Bentley v. State*, 520 S.W.2d 390 (Tex.Cr.App. 1975); *Reynolds v. State*, 489 S.W.2d 866 (Tex. Cr.App.1972); *Colunga v. State*, 481 S.W.2d

866 (Tex.Cr.App.1972); *Cherb v. State*, 472 S.W.2d 273 (Tex.Cr.App.1971); *Chapman v. State*, 470 S.W.2d 656 (Tex.Cr.App.1971); *Rogers v. State*, 461 S.W.2d 399 (Tex.Cr.App.1970).

**11.** See also *Walker*, supra; *Edwards*, supra; *Langford*, 121 Tex.Cr.R. 5, 50 S.W.2d 808 (1932).

**12.** See also *Walker*, supra; *Bentley*, supra; *Reynolds*, supra; *Barnett v. State*, 163 Tex. Cr.R. 270, 290 S.W.2d 234 (1956); *Hawkins v. State*, 124 Tex.Cr.R. 23, 60 S.W.2d 227 (1930).

**13.** See *Walker*, supra; *Bentley*, supra; *Reynolds*, supra; *Minor*, supra; *Graves v. State*, 123 Tex.Cr.R. 226, 58 S.W.2d 122 (1933); *Holmes*, supra.

may be in regard to facts related by him which are extraneous or immaterial to the criminal responsibility of *the defendant*; "unless there is some proof, independent of his testimony, tending to connect the defendant with the commission of the crime, there is no sufficient corroboration." *Chambers v. State*, 44 S.W. 495, 495 (Tex. Cr.App.1898).[14]

And what is meant by the "offense committed?" In the instant case, appellant stood charged with being an "*accomplice* to murder with malice aforethought." In 1907, this Court, through Presiding Judge Davidson, observed that where a party is charged as an accomplice *to an offense*,

"... [I]t is in the nature of a compound offense: First, he must have done those things denounced by the statute in bringing about a subsequent offense [advise, command, encourage]; and second, that that offense must be consummated. *There would be no offense, unless the offense in contemplation was subsequently committed.*"

*Hall v. State*, 52 Tex.Cr.R. 250, 106 S.W. 379, 380 (1907). Restated in somewhat more contemporary language,

"One charged as an accomplice ... by advising the commission of a subsequent offense in advance of its commission, does not become an accomplice until the substantive offense is committed; that is to say, if in the present case the appellant advised the burglary he would not be guilty as an accomplice unless the burglary was committed."

*Graves v. State*, 123 Tex.Cr.R. 226, 58 S.W.2d 122, 124 (1933). Thus, an accomplice to the crime has completed his criminal act *before* the object crime is actually committed, but his criminal liability attaches only after its commission, by virtue of his previous conduct in bringing the object offense about through the agency of third parties. *Chapman v. State*, 470 S.W.2d 656 (Tex.Cr.App.1971); *Graves*, supra; *Weatherred v. State*, 100 Tex.Cr.R. 199, 272 S.W. 471 (Tex.Cr.App.1925); *Hall*, supra.

So, when the accused is charged as an accomplice to an offense, and the State relies on the testimony of an accomplice witness,[15] "the testimony must not only be corroborated as to the *fact that the offense was committed*, but must be corroborated *with equal cogency that the party accused as an accomplice [to the crime] brought himself within the purview of the statute in his advice or assistance*." *Hall*, supra, 106 S.W. at 380. Thus, in the instant case it was encumbent upon the State to proffer corroboration of McKittrick's testimony *both* that John Hill was murdered, and that appellant Paulus, *before* the murder, advised, commanded or encouraged McKittrick and Bobby Vandiver to commit that murder.

With these principles in mind, we now turn to an assessment of the sufficiency of the State's corroborative evidence tending to connect appellant with the criminal conduct alleged.

Initially we note the evidence corroborating the murder of Dr. John Hill by Bobby Vandiver is ample and need not be further assayed. Equally sufficient independent evidence was adduced to corroborate McKittrick's admission that she furnished the murder weapon to Vandiver. Thus, the only remaining question is whether the record reflects evidence tending to connect appellant with the culpable conduct alleged against *her*—that is, advice, command or encouragement to McKittrick and Vandiver to commit the murder *before* it was done—

---

14. *Walker,* supra; *Anders v. State*, 501 S.W.2d 665 (Tex.Cr.App.1973); *Reynolds*, supra; *Chapman*, supra; *Thomas v. State*, 166 Tex. Cr.R. 331, 313 S.W.2d 311 (1958); *Melton v. State*, 127 Tex.Cr.R. 399, 77 S.W.2d 243 (1934); *Jordan v. State*, 122 Tex.Cr.R. 646, 57 S.W.2d 127 (1933); *Weatherred v. State*, 100 Tex.Cr.R. 199, 272 S.W. 471 (1925).

15. See n. 8 *ante* regarding the distinction between "accomplice to the offense" and "accomplice witness."

and thus corroborative of McKittrick's assertions in this regard.

The State argues that when all the non-accomplice witness evidence is considered, it corroborates appellant's role in the murder of Hill, and specifically points to the facts that appellant was shown to be a close associate of McKittrick at the time of the offense; that appellant therefore had the opportunity to advise and encourage commission of the murder; that appellant was acquainted with Ash Robinson and aware that he wanted Dr. Hill killed; and, the fact that a piece of paper was found in the search of appellant's house on which had been written the times of arrival of National Airlines flights from Houston to Las Vegas, Las Vegas to Houston and the roundtrip fare. These flight schedules were shown to have been in effect for approximately three years, including both the time of the offense and the time of trial. Several handwriting experts [16] testified that it could not be determined whether the flight schedules and roundtrip fare notations were in the hand of appellant. Appellant's estranged daughter, Mary Wood, insisted, however, they were in her mother's handwriting.

Mary Wood also supplied the testimony the State contends illustrated appellant's "knowledge that Ash Robinson wanted Dr. Hill killed:" according to Wood, in December of 1970, she heard her mother tell her father that Dianne Settegest had told her that she had heard Ash Robinson say he was looking for someone to kill Hill. Both Settegest and appellant denied this and appellant called her son who testified that not only was Wood never in appellant's home in December of 1970, but no one in the family knew where she was at that time. At any rate this evidence was hopelessly incompetent to prove that Ash Robinson wanted

Hill killed. Neither are we prepared to say this third-hand report was (other than for the "truth of the matter asserted") for the purpose of illustrating appellant's "state of mind," for the content of *appellant's* statement was a mere repetition of something someone else claimed to have heard! At best, that she repeated the report might be admissible as a prior "declaration of a party" inconsistent with her denial of knowledge about Robinson. But even treating Wood's testimony as competent corroborative evidence, we fail to see in what manner such constitutes an incriminating factor which, taken together with all the nonaccomplice witness evidence, tends to connect *appellant* with the commission of the offense alleged. Compare *Reynolds v. State*, 489 S.W.2d 866 (Tex.Cr.App.1973).

The State offered several items—such as telephone records which revealed calls made from appellant's home phone on November 16, a week before the murder: two to Seattle, Washington airlines and two to the Las Vegas Star Dust Hotel, and a message found in appellant's home which was for McKittrick—apparently to illustrate McKittrick's proximity to appellant prior to the murder. But appellant never denied and, in fact, readily conceded the accomplice witness had lived with her. Thus, the telephone records served merely to directly corroborate McKittrick's testimony that *she* and Vandiver were having difficulty locating their intended victim.

Appellant testified that she knew "of" Ash Robinson, but that he was not a personal acquaintance. She denied ever having had a private conversation with him, claiming she only knew him on sight and through horse show circles. This too, was hotly contested by the parties [17] and suffice it to say, some degree of connection or acquaintanceship between appellant and Ash Robin-

16. Including one who had been employed but not called by the State, and was discovered then called by the defense.

17. For example, the State introduced a piece of paper found in appellant's handbag at the time of her arrest, on which a telephone number was

written in a handwriting other than appellant's. The number was identified as having been an unlisted line belonging to Ash Robinson be-

son was shown by the nonaccomplice witness evidence. But even if the State had proved appellant and Robinson were intimate associates, to assign incriminating significance to such fact would require that we first assume Ash Robinson's involvement in the plan to murder Hill; Robinson's involvement was *not* established, however, apart from the testimony of McKittrick.

While surely not intended as a confession of error, the State's brief suggests that "[t]he corroborating evidence in the case at bar is significant *when tied to McKittrick's testimony.*" We are constrained to agree. But the validity of this statement defeats the State's position in this case, for the long established rule regarding the requirement of corroboration is:

> "By 'corroboration' is meant that the corroborative evidence, to be sufficient, must, *of itself and without the aid of the accomplice [witness]* testimony in some degree, tend to connect the defendant with the commission of the offense for which he is on trial. . . ."

*Holmes*, supra, 157 S.W. at 493.

Without the aid of the criminal network described by McKittrick, the combined circumstances otherwise proved establish at most that appellant knew the father-in-law of the victim; that the victim was killed by

Bobby Vandiver and Marcia McKittrick; that appellant was a close associate of the accomplice witness, McKittrick, and shared her home with her some months prior to the offense; that the victim was killed on his return from Las Vegas, and a schedule of flight arrivals from Las Vegas to Houston, Houston to Las Vegas, the round trip fare and a notation of National Airlines' telephone number—all of which had been in effect for a number of years—was found in appellant's home, written in her handwriting. In short, the only people this combined evidence tends to connect to the murder of John Hill are McKittrick and Vandiver.

Cumulatively, this evidence places the accomplice witness in the company of appellant prior to the time of the object offense. But as was again recently observed in *Nelson v. State*, 542 S.W.2d 175, 177 (Tex.Cr. App.1976),

> "The mere presence of the accused in the company of the accomplice [witness] shortly before or after the time of the offense is not, in itself, sufficient corroboration of the testimony of the accomplice witness. . . . However, the presence of the accused with the accomplice [witness], when coupled with other circumstances, may be sufficient." [Citations omitted.] [18]

See also *Cherb v. State*, 472 S.W.2d 273 (Tex.Cr.App.1971). The "other circum-

---

tween sometime in September of 1972 and November 3, 1972.

The defense called a telephone company official who conceded that his records regarding the number contained inaccuracies and he could not determine with certainty when the number had been installed; he agreed, however, that the service could have begun on September 29, 1972 (after the murder) according to one notation.

The defense then called Ash Robinson's personal attorney, who had gone to the Robinson residence as soon as he heard of the death of Dr. Hill. The trial judge, however, would not allow before the jury the attorney's testimony that, after he answered the Robinson phone several times to be met with harrassing messages, he advised his client to obtain an unlisted telephone number. We relate this testimony because we believe the trial court erred in ruling the content of the calls received at the Robinson residence was being "offered for the

truth of the matters asserted" and thus, hearsay, when clearly it was not.

The defense also called Diane Settegest who testified that over different visits to Houston, she had been given a third phone number for Robinson—to the best of her knowledge it was after Hill's death—and that she could have given this number to appellant. Settegest confirmed that, having been a close friend of both appellant and Robinson for several years, she had no knowledge whatever that her two friends knew each other. She speculated that appellant would know who Robinson was, but doubted Robinson would recognize appellant.

18. In *Weatherred*, supra, 272 S.W. at 472, the rejection of "guilt by association" in this context was reasoned thus:

> "If such testimony [placing the defendant and the accomplice witness together before and after the offense] be corroborative, then accomplices might be held corroborated in their claim of the guilt of any person upon

stances" which have been discussed as adequately suspicious when coupled with "presence" to corroborate accomplice witness testimony are, subsequent flight, *Cawley v. State,* 166 Tex.Cr.R. 37, 310 S.W.2d 340 (1957); unseasonableness of the hour, without reasonable explanation therefor or lack of apparent reason for such presence, *Edwards,* supra; and possession of fruits or instrumentalities of the crime, *Cherb,* supra.

None of these "other circumstances" are extant in the instant case, and the weight of appellant's association with McKittrick is further reduced as an incriminating circumstance when "considered . . . in light of the fact that both the appellant and [the accomplice witness] lived in the neighborhood"— and in fact, in the same house. See *Rogers v. State,* 461 S.W.2d 399, 402 (Tex.Cr.App. 1970).

The fact that a round trip flight schedule and air fare notations of National Airlines between Houston and Las Vegas were found in appellant's house, written in her hand, has at best ambivalent probative force. Notwithstanding appellant's denial that she made the writing, it could have been made at anytime over a several year period.[19] Even if we speculate appellant made the writing sometime close but prior to the murder, it seems even more reasonable that the inquiry was made at the behest of McKittrick who was considering round trip flights because she and Vandiver were having difficulty locating their prey. McKittrick testified that she and Vandiver ultimately *drove* to Las Vegas and back about ten days before the murder. Otherwise, the notations of arrivals in Las Vegas *from* Houston, and the *round trip* fare are completely unexplained.

Clearly, the State's corroborative evidence is entirely consistent with the notion[20] that the accomplice witness, herself, committed the act of encouraging or advising Vandiver (if any such acts occurred at all) to murder Dr. Hill, or that she and Vandiver—motivated by robbery—planned and committed the offense alone.[21] Fatal to the State's case is the tandem failure to corroborate that appellant even knew Vandiver, the killer, or that Ash Robinson paid someone—anyone—to kill Hill. Without this latter proof, there is no corroboration tending to show that *the crime alleged* against appellant was committed at all![22] Thus, as the State inadvertently conceded,

whom they might seek to fasten the crime, by mere proof that such parties had been seen together."

**19.** Compare *Walker,* supra, [fingerprint could have been made anytime within two weeks]; *Chapman,* supra, [writing on paper napkin and accused found with a pen in hand at time of arrest not shown to relate to robbery]; *Melton v. State,* 127 Tex.Cr.R. 399, 77 S.W.2d 243 (1934) [telephone logs corroborated parts of accomplice witness testimony, but not the parts incriminating accused]; and *Denson v. State,* 47 Tex.Cr.R. 439, 83 S.W. 820, 820 (1904) [statement made by accused could have related to any matter "as well as to the commission of the burglary"].

**20.** Indeed, the *reasonable* outstanding hypothesis. Compare *Bird v. State,* 423 S.W.2d 919 (Tex.Cr.App.1967) and *Barnett v. State,* 163 Tex.Cr.R. 270, 290 S.W.2d 234 (1956) with *Carter v. State,* 104 Tex.Cr.R. 163, 283 S.W. 174 (1926).

**21.** The same inadequacy inheres in the State's evidence that a telephone call was made from appellant's residence on November 11 to Bobby Vandiver's sister's home. Though McKittrick claimed appellant made this call to inform Vandiver "what had gone wrong was right again," there is nothing apart from McKittrick's claim to show it was appellant, rather than the accomplice witness herself, who made the call.

**22.** It has been observed numerous times by this Court that the mere showing that the offense charged against the accused occurred, is insufficient corroboration of the accused's participation therein. *Walker,* supra; *Nelson,* supra; *Bentley,* supra; *Reynolds,* supra; see also Article 38.14.

Clearly, the *total* failure to corroborate that the offense charged against an accused occurred *at all,* will render the corroboration insufficient *as a matter of law* to support any conviction. See, e.g., *Odom,* 438 Tex.Cr.App.1969); *Melton,* supra; and *Hall,* supra; *Denson,* supra.

without "bootstraping" the framework constructed by the accomplice witness testimony, the circumstances adduced for corroboration are insignificant in tending to connect appellant with any advice or encouragement which may have been given to McKittrick and Vandiver to commit the murder of John Hill.

While some of the details related by the accomplice witness are supported by evidence from other sources, the cumulative force of that which is corroborated at best creates a suspicion that appellant might have advised or encouraged the murder of Hill, and at worst verifies fragmentary extraneous matters which in no way tend to incriminate appellant; either way, the requirements of the law are not met. *Thomas v. State*, 166 Tex.Cr.R. 331, 313 S.W.2d 311 (1958); *Roberd v. State*, 161 Tex.Cr.R. 188, 276 S.W.2d 270 (1955); *Almazan v. State*, 140 Tex.Cr.R. 432, 145 S.W.2d 576 (1940) [holding corroborative evidence creating suspicion that accused may have committed offense charged insufficient]; *Walker v. State*, 615 S.W.2d 728 (Tex.Cr.App. 1981); *Reynolds*, supra; *Chapman*, supra; *Thomas*, supra; *Melton*, supra; *Jordan v. State*, 122 Tex.Cr.R. 646, 57 S.W.2d 127 (1933); *Weatherred v. State*, 100 Tex.Cr.R. 199, 272 S.W. 471 (1925); *Chambers*, supra [holding corroboration of immaterial matters which are not criminative facts is never sufficient].

As such, the evidence adduced by the State for corroboration of the testimony of the accomplice witness, Marcia McKittrick, is insufficient and appellant's conviction must be reversed. See *Chapman*, supra; *Thomas*, supra; *Melton*, supra; *Weatherred*, supra; *Denson*, supra. And under the authority of *Walker*, supra, the judgment of conviction must be reformed to reflect an acquittal. Cf. *Thornton v. State*, 601 S.W.2d 340 (Tex.Cr.App.1980) (Opinion on motions for rehearing).

It is so ordered.

ONION, Presiding Judge, dissenting.

I fully agree with the majority that this voluminous record of 2,350 pages presents an uncommonly complex case, and I acknowledge at the outset that, under all the facts and circumstances of the case, the decision call is extremely close. I disagree, however, with the result reached.

The conviction was for being an accomplice to murder with malice aforethought under our former Penal Code (See Articles 70, 72, 1256 and 1257, V.A.P.C., 1925). The punishment of 35 years' imprisonment was assessed by the jury.

Appellant's foremost contention on appeal is that the evidence is insufficient to corroborate the testimony of the accomplice witness, Marcia McKittrick, and thus to sustain the conviction. Appellant relies upon Article 38.14, V.A.C.C.P., which requires the corroboration of an accomplice witness. McKittrick made out a complete case against the appellant, and except for the requirement of Article 38.14, supra, the conviction would be easily affirmed.

Turning to the record before this court, it is found that, omitting the formal parts, the indictment alleged:

"Bobby Wayne Vandiver and Marcia McKittrick on or about the 24th day of September, A.D. 1972, in said County and State did with malice aforethought kill John Hill by shooting him with a gun.

"And the Grand Jurors aforesaid do further present in and to said court that Lilla Paulus on or about 24th day of September, A.D., 1972, prior to the commission of the said offense by the said Bobby Wayne Vandiver and Marcia McKittrick as aforesaid, in the County of Harris and State of Texas, did unlawfully and wilfully advise, command, and encourage the said Bobby Wayne Vandiver and Marcia McKittrick to commit said offense, the said Lilla Paulus not being present at the commission of the said offense by the said Bobby Wayne Vandiver and Marcia McKittrick . . . ."

Article 70, V.A.P.C. (1925), defined an accomplice *to the crime* as

"An accomplice is one who is not present at the commission of an offense,

but who, before the act is done, advises, commands or encourages another to commit the offense; or

"Who agrees with the principal offender to aid him in committing the offense, though he may not have given such aid; or,

"Who promises any reward, favor or other inducement, or threatens any injury in order to procure the commission of the offense; or,

"Who prepares arms or aid of any kind, prior to the commission of an offense, for the purpose of assisting the principal in the execution of the same." [1]

It is clear from the record before us the appellant was charged under the first mode of Article 70, supra (the first paragraph of the statute quoted above). The State thus had the responsibility of proving beyond a reasonable doubt that appellant was an accomplice to the crime of murder in the mode charged.

The record reflects that at approximately 7:30 p. m. on September 24, 1972, Dr. John Hill was shot to death at his home in Houston. Hill and his wife, Connie, had just returned to Houston on National Air Lines from a trip to Seattle, San Francisco and to a medical convention at Las Vegas. As the Hills arrived by taxi at their home on Kirby Drive in the River Oaks section of the city, they were confronted at the door by a masked man with a gun who announced it was a robbery. The masked individual, deceased at the time of trial,[2] and later identified as Bobby Wayne Vandiver,[3] had been waiting at the Hill home in anticipation of the Hills' arrival and had bound and gagged Hill's mother and his 12-year-old son, Robert. Hill and Vandiver struggled, and Hill's wife ran for help. Vandiver fled after shooting Hill four times with a .38 caliber pistol. The cause of death was shown to be the result of gunshot wounds.

At the time of his death Dr. Hill was under indictment for murder in the death of his first wife, Joan, daughter of Ash Robinson. The trial on said charge had resulted in a mistrial. A second trial was pending. It appears from the evidence that there was a great deal of animosity between Hill and Ash Robinson.

Marcia McKittrick was the State's principal witness, whom the court designated as an accomplice witness as a matter of law in

1. It has been said an accomplice *to the crime* is one who has completed his offense before the crime is actually committed, and whose liability attaches after its commission, by virtue of his previous acts in bringing it about through the agency or in connection with third parties. *Burow v. State*, 85 Tex.Cr.R. 133, 210 S.W. 805 (1917); *Harper v. State*, 117 Tex.Cr.R. 501, 33 S.W.2d 455 (1930).

Care should be taken to distinguish between an accomplice to the crime or offense (Article 70, V.A.P.C., 1925) and the meaning of an accomplice witness as contemplated by Article 38.14, V.A.C.C.P. (1965).

Under the 1925 Penal Code the parties to a crime at common law were codified into Texas law as principals, accomplices to the crime (accessories before the fact) and accessories (after the fact). However, when reference is made to an accomplice witness, it means a person who, either as a principal, accomplice or accessory, was connected with the crime by unlawful act or omission on his part, transpiring either before, at the time of, or after commission of offense, whether or not he was present and participated in the crime. *Carna-*

*than v. State*, 478 S.W.2d 490 (Tex.Cr.App. 1972), cert.den. 409 U.S. 866, 93 S.Ct. 160, 34 L.Ed.2d 114.

While a principal to a crime, an accomplice to a crime, and an accessory were separate and distinct offenses under the former codes, *Dinklage v. State*, 135 Tex.Cr.R. 10, 117 S.W.2d 111 (1938); *Lopez v. State*, 170 Tex.Cr.R. 208, 339 S.W.2d 906 (1960), when these individuals testified for the State in the trial of another for the same crime they all were considered accomplice witnesses for the purposes of Article 38.14, supra. Much confusion has arisen since many opinions refer to accomplice meaning in fact an "accomplice witness" and another time meaning "accomplice to the crime."

2. It was shown that Vandiver had been killed by a city of Longview policeman in 1974 while resisting arrest.

3. Hill's son identified a photograph of Vandiver as the man who broke and entered the Hill home before the arrival of the doctor and his wife.

its charge to the jury. She was an admitted prostitute from Dallas who was 25 years old at the time of the instant trial.[4] She related she met Vandiver during her childhood and met him again when she was "working"[5] in Houston and he became her "chip"[6] or boyfriend, who was aware of her profession and who travelled with her from time to time while she practiced her profession. Vandiver informed her that from time to time he committed robberies. McKittrick testified she believed she met the appellant Paulus at the Houston airport in January 1972, and on that day or the next day she went to appellant's home on Underwood Street in Houston and thereafter she stayed at appellant's home whenever she was in Houston—approximately three months all together from the time she met appellant until the time of the alleged offense. She related appellant was aware of her "activities" and that from time to time she worked as a member of the world's oldest profession at the Wm. Penn Hotel.

During her stay at appellant's home, she related appellant asked her if she knew of anyone interested "in filling a contract," meaning a killing without mentioning any intended victim. McKittrick agreed to make inquiries. Thereafter she met Ash Robinson at appellant's home and appellant later told her that Robinson was the one who wanted a contract on Dr. John Hill of whom she had not heard. She saw Robinson at appellant's house several times and concluded he seemed obsessed with his grandson and the question of his custody.

McKittrick revealed she mentioned the "contract" to Vandiver in the spring or early summer of 1972, while they were in Dallas, and two weeks or so later, she introduced Vandiver to the appellant at appellant's home in Houston. She related appellant asked Vandiver if he was interested in the "contract" for $5,000.00, and stated, without revealing the source, that she would receive her money from the same source as Vandiver. Vandiver agreed and they discussed details. Later, McKittrick and Vandiver decided to "forget it" and returned to Dallas. In the late summer, McKittrick related, the appellant called Vandiver at his sister's house in Dallas and told him the contract was on again and "... what had gone wrong was right again." McKittrick and Vandiver returned to Houston, and several weeks before September 24, 1972, the appellant took them on at least three occasions to the Hill home on Kirby Drive, discussing Hill's routine and mentioning the people who were normally there. McKittrick related that once Ash Robinson came to appellant's home while Vandiver was there, but Vandiver was asleep. She stated on occasion she was with the appellant when appellant met Robinson at the Ben Taub Hospital in Houston, but she stayed in appellant's car and that appellant would sit in Robinson's car or they would walk. She related she couldn't hear any conversation, but on several occasions it appeared Robinson handed money to the appellant.

McKittrick related that prior to September 24, 1972, appellant told Vandiver the money was to come from Ash Robinson because Robinson was convinced that Hill would never be convicted of his daughter's death and that this was the only way he could get justice. Appellant gave McKittrick and Vandiver a coffin shaped picture of Hill. In an effort to locate Hill, McKittrick made phone calls from appellant's home to Seattle and to Las Vegas. She stated the appellant was aware of these calls. Unable to locate Hill, McKittrick and Vandiver drove to Las Vegas in an effort to

---

4. In her testimony she admitted she had been convicted for her participation in the murder of Dr. Hill [*McKittrick v. State*, 541 S.W.2d 177 (Tex.Cr.App.1976)], had been convicted of felony theft in Dallas County, and had become a heroin addict since the time of the alleged offense.

5. She indicated this meant as a prostitute.

6. She described a "chip" as a "bed partner."

find Hill a few days before September 24th. Unable to locate Hill, they returned to Houston where the appellant told them that Hill was to return the next day but that Ash Robinson didn't know which flight. Appellant informed McKittrick that Ash Robinson had given her $7,000.00. On the morning of September 24, 1972, McKittrick saw Robinson at appellant's home and he stated that Hill would have $15,000.00 on his person. McKittrick testified the appellant had the arrival times for the National Airlines flights from Las Vegas on that day, but appellant didn't know which flight Hill would be on, so McKittrick called the ticket agent for National Airlines and learned Hill was due to arrive in Houston at 6:38 p. m. She identified the front of State's Exhibit # 21 containing the time of the incoming flights from Las Vegas to be in appellant's handwriting.

McKittrick related she and Vandiver then calculated the time it would take a taxi to come from the airport and about 7 p. m. they drove to the Hill home. After Vandiver knocked on the door and entered the house, McKittrick drove the car to the House of Pies on Kirby Drive and waited for Vandiver to call on the pay phone as previously agreed. She waited an hour until Vandiver called and said there had been a "rumble." She picked him up at a Stop and Go convenience store and they returned to appellant's home. There appellant gave Vandiver $5,000.00 and he returned $1,500.00—$1,000.00 for steering him to the job and $500.00 for the advance she had given to them for the trip to Las Vegas.

McKittrick related she and Vandiver then left for Dallas where they learned from television news reports the pistol used had been recovered from some bushes near the Hill home. McKittrick admitted she had acquired the .38 caliber pistol involved from Dr. William Mitchell of Longview, who was one of her "tricks" or customers and that she had given it to Vandiver sometime before the alleged offense.

Dr. Mitchell testified and acknowledged that he had given the .38 caliber pistol to McKittrick.

The State offered evidence relating to appellant's arrest on April 25, 1973, over seven months after the alleged offense, at a house at 3024 Pine Gulley Street in Houston where she was living at the time with one Corley Myers. In her purse was a piece of paper on which the number "523-3746" was written. It was shown to correspond to the once unlisted telephone number of Ash Robinson. The telephone number was not in appellant's handwriting.

In a search of appellant's home at 3654 Underwood on the same date, police officers found a blank personalized check # 117 on a joint account of the appellant and her husband, who was then deceased. This check was found in a night stand in the back bedroom. On the check was written, "You had better tell Ash they are trying to sepono (sic) Ma." It was shown "Ma" was commonly used in reference to Robinson's wife. The writing was not in appellant's handwriting.

In the search of appellant's house on Underwood the police found several slips of paper in a chest near a telephone in the den. The first slip (State's Exhibit No. 21) contained the following handwritten notations:

| (front of slip) | (back of slip) |
|---|---|
| 6:33 AM = | 224-9091 |
| 2:18 PM = | 11 AM = |
| 6:38 PM = | 1:55 PM = |
| | 7:20 PM = |
| Wm. Penn | $164^{00}$ RT |
| 222 0231 | 8:00 |
| | 155 AM |
| | 940 AM |
| | 200 AM |

(Upside down on the back)

the second note (State's Exhibit No. 22A) was as follows:

```
AC
214
753 3084
OP. 6
 Dr. Mitchel
 Dusty
```

The apparent times listed on the front of State's Exhibit No. 21 were shown to coincide with the arrival times of National Airlines flights into Houston from Las Vegas during 1972 and 1973, etc. The notations on the bottom part of the front of said exhibit were shown to relate to the Wm. Penn Hotel and a telephone number. The State offered appellant's daughter, Mary Wood, who testified the handwriting on the front of State's Exhibit No. 21 was that of her mother's.[7] Two handwriting experts called by the defense, including one from the Houston Police Department, were unable to testify that the handwriting on the front of such exhibit was that of appellant's.

The notations on the back of the exhibit were shown to coincide with the round trip times of National Airlines flights between Houston and Las Vegas and were not in appellant's handwriting. The upside down figures were shown to be in McKittrick's handwriting and were apparently made as a result of a gin rummy game.

State's Exhibit No. 22A was shown to be a telephone message for McKittrick who "worked" under the name "Dusty." The message was not in appellant's handwriting. It was apparently from Dr. Mitchell.

It was shown by a security supervisor of the Southwestern Bell Telephone Company that telephone calls from appellant's home phone were made on September 16, 1972 to Western Airlines and Air West, Inc., in Seattle and to the Stardust Hotel in Las Vegas. The record also shows a telephone call on September 11, 1972 to Kenneth Hotchkins' home in North Mesquite, shown to be the residence of Vandiver's sister according to McKittrick. Apparently because of some mix-up in telephone company records the supervisor-witness was unable to pinpoint the exact date the unlisted phone

(523–3746) for Ash Robinson was installed. He could only say it was in operation from sometime late in September until November 3, 1972, when the original listed phone number was reinstated. Whether the unlisted phone was installed prior to Hill's death is thus not revealed.[8]

The appellant testified denying that she participated in the alleged offense. She denied knowing Vandiver or acting as a liaison for Robinson. She related she knew Robinson only "on sight and through horse show circles," but never had a private or intimate conversation with him. "I know of him and I have seen things in the news about him, but personally he is not an acquaintance of mine." She stated she met McKittrick in the spring of 1972 when she was introduced to her by Bill McDonald, a friend of her late husband. She acknowledged that McKittrick stayed at her house on Underwood Street from time to time and had a key to the house. Sometimes McKittrick would stay in the middle bedroom and sometimes in the back bedroom. Appellant related she did not know whether McKittrick was a prostitute, but suspected it later and told McKittrick not to bring her men friends to her (appellant's) home.

Appellant testified that Dianne Settegest, a close friend of Joan Hill before her death and of Ash Robinson, stayed at her home when she was in Houston in 1971 to testify at the murder trial of Dr. Hill and that she (appellant) attended a portion of the trial when Settegest testified. Settegest planned, she said, to stay with her again when she returned to testify at Dr. Hill's second trial. She related the number "523–3746" on a slip of paper in her purse was not in her handwriting and could have been given to her by Settegest.

Appellant related she met Corley Myers in the summer of 1972, became engaged to

7. McKittrick also testified the handwriting was that of appellant's but her testimony must be considered in light of Article 38.14, V.A.C.C.P.

8. The trial court refused to let Ash Robinson's attorney testify that after Dr. Hill's death he advised Robinson to secure an unlisted telephone number because of the many calls Robinson received on his listed number.

him, and in the late summer of 1972 moved in with him in his house on Pine Gulley in Houston. She did not completely abandon her house on Underwood as she returned to pick up the mail and stayed a few days from time to time, but she stayed most of her time at Myers' house. It was there that she was arrested seven months after the death of Dr. Hill.

The State, in rebuttal, called Joan Jaworski Worrell, who testified she had seen the appellant in a conversation with Ash Robinson at Chatsworth Farms, a horse farm, once in 1965 and twice thereafter, the last time being in early 1969 before Joan Robinson Hill's death. Worrell also testified she had seen the appellant with Robinson in a restaurant in New Orleans in April, 1970, when she (Worrell) was staying at the Fairmont Hotel there.[9]

Mary Wood, appellant's daughter, testified for the State. She stated that in 1963 or 1964 she met Joan Robinson Hill through Dianne Settegest and that at the Hills' home on MacArthur Street she and her mother were introduced to Ash Robinson. Later they visited a number of times in the Hill home in River Oaks and on occasion Ash Robinson would be there and she and her mother conversed with him. She related that on occasion she and her mother would sit in the Robinson box at horse shows with Robinson and his wife. During December, 1970, while on a visit to her parents' home, Wood heard her mother say that Dianne Settegest had called and said Ash Robinson was looking for someone to kill John Hill.[10] She testified that her mother's reputation for truth and veracity was bad.

The defense called Dianne Settegest of Dallas, who was born and raised in Houston. She related she rode show horses as did Joan Robinson Hill and that she met Joan and her father at a horse show in Baton Rouge in 1952; that she met the appellant, Lilla Paulus, at the Almeda Stables in Houston in 1957 or 1958; that Chatsworth Farm Stables operated by Joan Robinson Hill were opened in 1963 and she spent many week-ends there and was manager of the farm from September 1968 to February 1969. She stated she never saw appellant and Ash Robinson there together. The only time appellant was there was when she invited the appellant to come to the farm for a drink during the Christmas season of 1968. She knew of no acquaintanceship between Ash Robinson and the appellant. She doubted if Ash Robinson knew who Lilla Paulus was though Lilla might recognize Ash. She attended many horse shows and never saw the appellant sitting in the Robinson box and never saw the appellant at the home of the Hills.

She testified that immediately preceding Joan Robinson Hill's death she was staying at the Hill home; that when she returned from Dallas to testify before the grand jury in connection with Joan's death she stayed at Ash Robinson's home; that when she came back to testify at Hill's trial she stayed at appellant's home on Underwood Street.

She denied that she ever told the appellant Ash Robinson wanted John Hill killed. She acknowledged that she had three phone numbers for Ash Robinson. She had two numbers "... [A]nd then, at some point, I was given another." To the best of her knowledge it was given to her after Hill's death. It was a possibility that she gave this number to the appellant as she (Settegest) was going to see Robinson, but she had no specific recollection.

Article 38.14, V.A.C.C.P., provides:

"A conviction cannot be had upon the testimony of an accomplice unless corrob-

---

9. The defense offered evidence that the records of the said Fairmont Hotel did not show that Worrell was a guest at such hotel in April, 1970, or during the months of January, February or March of that year.

10. The defense offered evidence the witness Wood did not visit her mother's home in December 1970.

orated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense."

This provision has been a part of every Code of Criminal Procedure ever adopted in this state, *Rogers v. State*, 122 Tex.Cr.R. 331, 54 S.W.2d 1010 (1932), and the language of the statute has remained the same.

An accomplice witness [11] has been described as a discredited witness. *Cast v. State*, 164 Tex.Cr.R. 3, 296 S.W.2d 269 (1956); *Odom v. State*, 438 S.W.2d 912 (Tex. Cr.App.1969); 23 C.J.S., Crim.Law, § 808, p. 72. It has been frequently said that the testimony of an accomplice witness is untrustworthy and that it should be received and viewed and acted on with caution. 23 C.J.S., Crim.Law, § 808, p. 72. In *Comm. v. Turner*, 80 A.2d 708, 367 Pa. 403, it was said that the testimony of an accomplice witness is to be carefully scrutinized not only because of any interest he or she might have, but because her or his testimony is evidence from a corrupt source. It is well established by virtue of Article 38.14, supra, that the testimony alone of an accomplice witness cannot furnish the basis for a conviction. *O'Neal v. State*, 421 S.W.2d 391 (Tex. Cr.App.1967); *Boone v. State*, 96 Tex.Cr.R. 644, 259 S.W. 581 (1924), and a conviction so based must be reversed. *Walker v. State*, 94 Tex.Cr.R. 567, 252 S.W. 554 (1923). And this is true no matter how complete a case may have been made by the accomplice witness' testimony, *Meyer v. State*, 104 Tex. Cr.R. 6, 282 S.W. 233 (1926), and no matter how much credit the jury might have given to such testimony. Article 38.14, supra, note # 54.

In *Edwards v. State*, 427 S.W.2d 629 (Tex.Cr.App.1968), this court wrote:

"The test as to the sufficiency of the corroboration is to eliminate from consideration the evidence of the accomplice witness and then to examine the evidence of other witnesses with the view to ascertain *if there be inculpatory evidence, that is evidence of incriminating character which tends to connect the defendant with the commission of the offense.* If there is such evidence, the corroboration is sufficient; otherwise it is not. *Dalrymple v. State*, Tex.Cr.App., 366 S.W.2d 576; *Bradford v. State*, 170 Tex.Cr.R. 530, 342 S.W.2d 319." (Emphasis supplied.) See also *Odom v. State*, 438 S.W.2d 912 (Tex.Cr.App.1969); *Cherb v. State*, 472 S.W.2d 273 (Tex.Cr.App.1971); *Reynolds v. State*, 489 S.W.2d 866 (Tex. Cr.App.1972); *James v. State*, 538 S.W.2d 414 (Tex.Cr.App.1976); *Etheredge v. State*, 542 S.W.2d 148 (Tex.Cr.App.1976); *Nelson v. State*, 542 S.W.2d 175 (Tex.Cr. App.1976); *Loa v. State*, 545 S.W.2d 837 (Tex.Cr.App.1977); *Dillard v. State*, 550 S.W.2d 45 (Tex.Cr.App.1977).

All the facts and circumstances in evidence may be looked to as furnishing the corroboration necessary. *Washburn v. State*, 167 Tex.Cr.R. 125, 318 S.W.2d 627, 634 (1958), cert. den. 359 U.S. 965, 79 S.Ct. 876, 3 L.Ed.2d 834. See *Brown v. State*, 561 S.W.2d 484 (Tex.Cr.App.1978). The corroborative evidence may be circumstantial or direct. 23 C.J.S., Crim.Law, § 812(3), f. 107 (note 51 with a host of Texas cases cited). See *Brown v. State*, supra. The combined cumulative weight of the incriminating evidence furnished by the nonaccomplice witnesses which tends to connect the accused with the commission of the offense supplies the test. *Perkins v. State*, 450 S.W.2d 855 (Tex.Cr.App.1970); *Windham v. State*, 479 S.W.2d 319 (Tex.Cr.App.1972); *Colunga v. State*, 481 S.W.2d 866 (Tex.Cr.App.1972). It is not necessary that the corroboration directly link the accused to the crime or be sufficient in itself to establish guilt. *Attwood v. State*, 509 S.W.2d 342 (Tex.Cr.App. 1974); *Reynolds v. State*, 489 S.W.2d 866 (Tex.Cr.App.1972); *Rainey v. State*, 401 S.W.2d 606 (Tex.Cr.App.1966); *Washburn*

11. An accomplice witness is defined in footnote 1.

*v. State,* supra. Apparently insignificant circumstances sometimes afford most satisfactory evidence of guilt and corroboration of the accomplice witness' testimony. *Holmes v. State,* 70 Tex.Cr.R. 423, 157 S.W. 487 (1913).

In *Reynolds v. State,* supra, it was said:

"The corroborative testimony need not directly link the accused to the crime or be sufficient in itself to establish his guilt. Otherwise, the testimony of the accomplice would be valueless. The corroborative evidence is sufficient if it tends to connect the accused with the crime, and it is the cumulative weight of such evidence which supplies the test."

What was said in *Reynolds* was expressed ·in *Minor v. State,* 108 Tex.Cr.R. 1, 299 S.W. 422 (1927), as follows:

"The law forbidding a conviction upon the uncorroborated testimony of an accomplice does not demand that there be direct evidence pointing to the accused as the offender, but merely requires that there be 'other evidence tending to connect the defendant with offense committed.' * * * Circumstances proved by credible witnesses may be as potent as direct testimony in tending to connect the accused with the commission of the offense. The state is not called upon to point to some single or isolated fact which in itself, unrelated to other proven facts, will be sufficient corroboration. It is the combined and cumulative weight of the evidence furnished by non-accomplice witnesses which supply the test. If by this rule it appears on appeal that before the jury there was proof confirming the testimony of the accomplice to material facts tending to connect the accused with the commission of the offense, the law is satisfied."

It must be remembered, however, that evidence which does no more than point the finger of suspicion towards an accused is insufficient to corroborate testimony of an accomplice witness. 24 Tex. Jur.2d, Evidence, § 694, p. 326, note 18, and cases there cited. In *Almazan v. State,* 140 Tex.Cr.R. 432, 145 S.W.2d 576, 579 (1940), this court wrote:

"For the purpose of corroborating testimony which is considered too unreliable to take human liberty, something stronger is required than mere suspicion."

In *Umsted v. State,* 435 S.W.2d 156 (Tex.Cr. App.1968), it was held that evidence which merely raised strong suspicions or the probability of guilt of the accused was insufficient to corroborate the testimony of an accomplice witness.

It should also be noted that although an accomplice witness may state any number of facts that are corroborated by evidence of other witnesses, still if the facts thus corroborated do not tend to connect the accused with the crime, corroboration on that basis would not meet the requirements of Article 38.14, supra; *Odneal v. State,* 117 Tex.Cr.R. 97, 34 S.W.2d 595 (1931); *Noble v. State,* 100 Tex.Cr.R. 404, 273 S.W. 251 (1925); *Reynolds v. State,* 489 S.W.2d 866 (Tex.Cr.App.1972); *O'Donald v. State,* 492 S.W.2d 584 (Tex.Cr.App.1973); *Anders v. State,* 501 S.W.2d 665 (Tex.Cr. App.1973).

"No precise rule can be laid down as to the amount of evidence that is requisite to corroborate the testimony of an accomplice, so as to sustain a conviction of the accused." 24 Tex.Jur.2d, Evidence, § 694, p. 325.

In applying the test of the sufficiency of the corroboration, each case must be considered on its own facts and circumstances—on its own merits. *Etheredge v. State,* 542 S.W.2d 148 (Tex.Cr.App.1976); *O'Donald v. State,* 492 S.W.2d 584 (Tex.Cr.App. 1973); *Barnett v. State,* 163 Tex.Cr.R. 270, 290 S.W.2d 234 (1956); *McCarty v. State,* 144 Tex.Cr.R. 408, 163 S.W.2d 200, 202 (1942). See also 23 C.J.S., Crim.Law, § 812(6), p. 134; *Forbes v. State,* 513 S.W.2d 72 (Tex.Cr.App.1974), cert.den. 420 U.S. 910, 95 S.Ct. 830, 42 L.Ed.2d 840.

It appears that McKittrick, the accomplice witness as a matter of law, made out

an almost complete case against the appellant. Without the requirements of Article 38.14, V.A.C.C.P., there could be no question as to the sufficiency of the evidence. Applying Article 38.14, V.A.C.C.P., as we are required to do, and the test of sufficiency of corroboration as discussed in *Edwards v. State*, supra, we must look to the non-accomplice witnesses' testimony.

The evidence, independent of that of the accomplice witness, reveals the murder of Dr. John Hill by Bobby Wayne Vandiver.

■ Article 38.14, V.A.C.C.P., however, expressly provides that evidence merely showing the commission of an offense is not sufficient alone to corroborate an accomplice witness. 24 Tex.Jur.2d, Evidence, § 694, p. 326. See also *Odom v. State*, 438 S.W.2d 912 (Tex.Cr.App.1969); *Windham v. State*, 479 S.W.2d 319 (Tex.Cr.App.1972); *Colunga v. State*, 481 S.W.2d 866 (Tex.Cr. App.1972); *Reynolds v. State*, 489 S.W.2d 866 (Tex.Cr.App.1972); *Anders v. State*, 501 S.W.2d 665 (Tex.Cr.App.1973); *Nelson v. State*, 542 S.W.2d 175 (Tex.Cr.App.1976). However, it is a factor to be considered along with other possible factors in determining where is sufficient independent evidence to corroborate the accomplice witness.

■ There was evidence that there was a great deal of animosity between Hill and Ash Robinson, his former father-in-law, over the death of Hill's first wife, Joan Robinson Hill. Hill had been charged with murder in connection with her death. His trial on said charge had ended in a mistrial and the charge was still pending at the time of his death. The evidence implies Ash Robinson had a motive for having Hill killed.

Appellant admitted she knew of Ash Robinson, but denied he was an acquaintance of hers. One witness placed appellant in the company of Robinson on several occasions, the first occasion being in 1965. Appellant's daughter, Mary Wood, testified she and her mother had visited in the Hill home in 1964 and 1965 and there they met Ash Robinson, and had on occasion sat in the Robinson's box at horse shows with Robinson and his wife "Ma." Wood also testified she heard the appellant say in December, 1970 that Diane Settegest had told her Ash Robinson was looking for someone to kill John Hill.

Appellant was shown to be a friend of Diane Settegest who had lived at the Hill home prior to Joan Hill's death, stayed at the Robinson home on occasion, and who stayed at appellant's home during Hill's trial at which she was a witness. On the day of her arrest, there was found in the back bedroom of appellant's home a blank personalized check of appellant's (# 117). On the check had been written the message, "Tell Ash they are trying to subpono (sic) Ma." It was shown that series of checks from the bank account of appellant from # 112 to # 120, with the exception of #'s 114 and 117, were cashed during the time of Hill's trial for murder. The writing on said check was not in appellant's handwriting.

In appellant's purse on the day of her arrest was a slip of paper containing numbers which corresponded with the unlisted telephone number of Ash Robinson in service from sometime in September until November 3, 1972.

The evidence is sufficient to corroborate McKittrick that appellant knew Ash Robinson. This is a factor also to be considered.

It was undisputed that McKittrick lived at appellant's house from time to time and had a key thereto during the period of time that McKittrick testified that appellant solicited her to find someone to "fill a contract" and during the time McKittrick stated appellant advised and encouraged her and Vandiver to carry out the contract.

■ It has been held that it may be shown in corroboration that the accomplice witness and the accused were intimate associates. *Brunett v. State*, 114 Tex.Cr.R. 244, 26 S.W.2d 208 (1930). In 23 C.J.S., Crim. Law, § 812(4)(g), pp. 119–120, it was writ-

ten, however, that "... it has been held not sufficient corroboration merely to show generally the accused was an associate of the accomplice at a time antecedent to the commission of the crime, or that they were together shortly before or shortly after the commission of the crime." See also *Cherb v. State*, 472 S.W.2d 273 (Tex.Cr.App.1971); *Moore v. State*, 521 S.W.2d 263 (Tex.Cr. App.1975); *Lyman v. State*, 540 S.W.2d 711 (Tex.Cr.App.1976). See further *Ayala v. State*, 511 S.W.2d 284 (Tex.Cr.App.1974).

■ The presence of the accused with the accomplice witness, however, may when coupled with other circumstances be sufficient to corroborate the testimony of the accomplice witness. *Nelson v. State*, 542 S.W.2d 175 (Tex.Cr.App.1976); *Dillard v. State*, 550 S.W.2d 45 (Tex.Cr.App.1977); *Moore v. State*, supra; *Cherb v. State*, supra.

■ Further, evidence which *merely* goes to show motive or opportunity of the accused to commit the crime is insufficient to corroborate the accomplice witness, although it may be considered in connection with other evidence tending to connect the accused with the crime. See 23 C.J.S., Crim.Law, § 812(4), p. 111; *Reynolds v. State*, 489 S.W.2d 866 (Tex.Cr.App.1972).

The records of the telephone company reflect that on September 11, 1972, a phone call from appellant's home and from a number listed to Claude Paulus, appellant's deceased husband, was made to the home of Vandiver's sister in Mesquite. The evidence indicates appellant was living alone at the time. This corroborates McKittrick's testimony that in the late summer while she and Vandiver were at her sister's house appellant called Vandiver and told him the contract was "on again."

While the Hills were on their trip to Seattle, San Francisco and Las Vegas, tele-phone company records show that on September 16, 1972, phone calls were made from appellant's home to two airlines in Seattle and to a hotel in Las Vegas.

Further, and most damaging, is the evidence that a slip of paper was found in the search of appellant's house, on the front of which was written the arrival times in Houston for National Airlines flights from Las Vegas which were in effect for September 24, 1972, the date of the alleged murder. Such notations on the front of the slip were in appellant's handwriting according to her daughter.[12]

As earlier noted, all the facts and circumstances in evidence may be looked to as furnishing the corroboration necessary. The corroborative evidence may be circumstantial or direct. Apparently insignificant circumstances sometimes afford the most satisfactory evidence of guilt and corroboration of the accomplice witness' testimony. It is not necessary that the corroboration directly link the accused to the crime or be sufficient in itself to establish guilt. The combined cumulative weight of the incriminating evidence furnished by the non-accomplice witnesses which tends to connect the accused with the commission of the offense supplies the test. Each case must be considered on its own facts and circumstances and on its own merits.

The trial court charged the jury on the law of accomplice witnesses and instructed the jurors that McKittrick was an accomplice witness as a matter of law. Viewing the evidence in the light most favorable to the jury's verdict as this court is required to do, and under the rules previously discussed, I would conclude that the evidence independent of the accomplice witness tends to connect the appellant with the crime charged and is sufficient to corroborate the accomplice witness' testimony.

---

12. McKittrick had testified that when she and Vandiver returned to Houston from Las Vegas in search of Hill appellant had obtained the time of the arrival of the National Airlines flights from Las Vegas, but did not know which flight the Hills would be on. McKittrick also testified the handwriting was appellant's, but her testimony cannot be considered in determining the sufficiency of the corroboration.

I would uphold the jury verdict and overrule appellant's contention.

I dissent to the reversal.

Before the court en banc.

## OPINION ON STATE'S MOTION
## FOR REHEARING

ONION, Presiding Judge.

On original submission to a panel of this court, the majority concluded the evidence is insufficient to sustain the conviction and ordered the judgment reformed to acquit the appellant.

 The majority of the court sitting en banc on rehearing now finds the evidence sufficient to sustain the conviction. This writer's dissenting opinion on original submission to the panel is now adopted as the majority opinion for the en banc court with regard to the sufficiency of the evidence question.

There are, however, other grounds of error that must now be considered.

 Appellant contends that she was denied a fair trial when the court allowed the prosecutor to show through the testimony of her daughter prior acts of misconduct and extraneous offenses on her part.

Specifically appellant complains of Mary Paulus Wood's testimony, upon being recalled, that appellant had her committed to the psychiatric ward of a hospital to prevent her from getting married, that the appellant waved a pistol around during a hospital visit, that appellant forced her into prostitution at the age of four, that business properties of her father and the appellant were houses of prostitution, and that appellant used to pick up her husband's bookie bet money, and Wood and her husband were threatened. The State contends this ground of error is multifarious and presents nothing for review. See *Rodriquez v. State*, 530 S.W.2d 944, 945 (Tex.Cr.App. 1975).

Mary Paulus Wood was called by the State and testified that appellant knew Ash Robinson and to other facts mentioned in the discussion of the sufficiency of the evidence discussed earlier. On cross-examination appellant's counsel elicited from Wood that she had "a falling out" with her mother and had not seen or tried to contact her mother for several years, that she had filed a lawsuit "against her mother" concerning her father's estate. On re-direct examination the State established that as a result of the "falling out" inquired about Wood left home, and the reason was "mainly one." Appellant's objection to further interrogation was sustained when the State made known to the court that it intended to show that the "falling out" occurred because Wood wanted to get married, angering her mother, and because her mother had forced her into prostitution. The State then rested.

The appellant then called Diane Settegest. When asked on direct examination when she last saw Wood, she answered, "Before she decided to take up the profession of prostitution. It was sometime in 1968, I believe." The State's objection was sustained, and the witness was admonished to answer the questions and not to volunteer anything. On cross-examination, without objection, the State established that Settegest knew that Wood was a prostitute and that she knew the Pauluses had rent property in Galveston. She denied knowing the property involved houses of prostitution or that the Pauluses received money from gambling, or that the Pauluses sought Mary after she left home for the purpose of eliminating her and Larry Wood. On re-direct examination appellant's counsel established Settegest knew that the Pauluses had Mary committed to a psychiatric ward and she escaped to marry Larry Wood. She denied that the appellant had forced Mary into prostitution at age four as implied by the State, or that appellant's efforts to find her daughter after her escape were to have her killed. On recross-examination Settegest acknowledged she had recommended a psychiatrist to the Pauluses for Mary before she was committed, and the psychiatrist was a friend of the Hills and the Robinsons.

Prior to the recall of Mary Wood, the appellant, out of the jury's presence, objected to the State eliciting from her evidence that she (appellant) allowed men to fondle her (Wood) when she was four years old. The objection was overruled, and counsel was instructed to object to each question asked by the prosecution. The court permitted, however, appellant's counsel to simply say during the upcoming interrogation, "I object," saying it would understand the basis of the objection being the same as then being urged.

Mary Wood, recalled by the State, testified without objection that she had been committed to St. Joseph's Hospital to keep her from getting married to Wood, who was 10 years older; that she was told if she could prove she wasn't on heroin she could get married. She discovered she was confined. Again, without objection, she testified appellant came to visit her and was waving a pistol around in the room, and it was taken from her by the nurses. Wood never knew her mother to be without a pistol. She testified in the past prostitution was a source of her income, and she had engaged in sexual activity since the age of four years at her mother's encouragement. When asked with whom she entered into such activity, appellant's counsel stated, "The Court does understand that my objection does go to this entire line of questioning?" The court responded, "All right." The objection came after the above stated evidence was already in the record. Wood then testified that the man was in his 60's when she was four years old, and that the sexual activity continued until she was 12 or 13 years old when the man died, and that at about 16 years of age she began to get calls and her mother often answered the phone and made the dates. Appellant's objection to this "entire line of questioning" was sustained. No further relief was requested. Over objection that the questions were leading and suggestive and an objection to the "line of questioning," Wood was permitted to answer her mother told her who called and where she was supposed to

be. Wood testified she went with appellant to Galveston to collect rent and "rob" juke boxes, that she knew the properties on Post Office Street were houses of prostitution, that she often went once a week to Galveston when she was in St. John's school. The objection to this interrogation was general in nature. "... how long do these lies have to go on?"

Then Wood testified she often accompanied her mother to pick up her father's bookie bets at news stands and at the Auditorium Hotel in Houston. Only after this evidence was in the record the objection was again to "this entire line of questioning." Thereafter, the witness testified that "Daddy" quit booking horses and sports when she was about 14 years of age. Then, without objection, she testified after her marriage there were acts of violence directed to her and her husband and they left Houston.

An examination of the record shows that the matters of which appellant complains came into evidence without objection or that the objection was tardy, coming only after the evidence was before the jury, *Stutes v. State*, 530 S.W.2d 309, 311 (Tex.Cr.App.1975); *Marini v. State*, 593 S.W.2d 709 (Tex.Cr.App.1980); *Lopez v. State*, 535 S.W.2d 643 (Tex.Cr.App.1976), or that the objection was general in nature preserving nothing for review, *Williams v. State*, 549 S.W.2d 183 (Tex.Cr.App.1977), or if the objection was sustained no further relief was requested. Further, some of the matters complained of were already in evidence as a result of the interrogation of the witness Settegest. Appellant's ground of error is overruled.

Appellant also contends the court erred in allowing the prosecutor to prejudice the jury with improper questions concerning the bad character of her husband and associates. Attention is directed to the cross-examination of the appellant. Complaint is made of the fact the prosecutor asked if the rooming houses on Post Office Street in Galveston which appellant had owned for

years were not whorehouses, whether her deceased husband had not received income from gambling enterprises, whether her husband was a bookmaker, and whether he was investigated for that activity from time to time. Complaint is also made about an inquiry if Bill McDonald (who introduced McKittrick to appellant) had not met a rather sudden demise in East Texas prior to trial.

The State argues that the ground of error is multifarious, and it is difficult to separate the contentions so as to determine whether the appellant is urging each individual question constituted reversible error or whether the combined effect of the prosecutor's questions should cause reversal. The State contends nothing is presented for review. *Rodriquez v. State*, 530 S.W.2d 944, 945 (Tex.Cr.App.1975).

As to the inquiry about McDonald, the record reflects the question was never answered, the objection was sustained and the jury was instructed to disregard, although the mistrial motion was overruled. With regard to the question of investigations, the question was never answered and the court sustained the objection and ordered the prosecution not to proceed with that line of interrogation. No reversible error is presented regarding these questions.

Prior to the question about the Galveston rent property being whorehouses, appellant testified that she was a widow at the time of trial, had sent her daughter to St. John's school, had been a Brownie leader, etc., and that her life style was different from that of McKittrick, whom she suspected and then later knew to be a prostitute. The question was asked and denied before an objection was offered that the same was an "absolutely improper suggestion by the prosecutor." The objection was overruled. We observe that the objection is not the same now urged on appeal. Nothing is presented for review.

■ The State's questions about whether appellant's husband received income from gambling enterprises and was a bookmaker were denied by the appellant and such interrogation was permitted over objection that appellant was not on trial for what her husband may have been during his lifetime. Appellant cited *Gant v. State*, 513 S.W.2d 52, 53 (Tex.Cr.App.1974). One may not be impeached by the character of her on his associates. *Gant v. State, supra; Koller v. State*, 518 S.W.2d 373 (Tex.Cr.App.1975). The court here erred in allowing questions about appellant's husband receiving income from gambling enterprises and being a bookmaker. In view of the denials by appellant and the subsequent testimony by Mary Wood and other facts and circumstances, we cannot conclude, however, the error is such as to call for the reversal.

■ Appellant further urges the "trial court erred in refusing to quash the indictment which was not signed by the foreman of the grand jury" as required by Article 21.02, V.A.C.C.P. Appellant contends the trial court erred in overruling her motion to quash the indictment.

A stipulation offered at the hearing on the motion to quash by the appellant and agreed to by the State shows that the foreman's signature on the indictment was a facsimile signature affixed by a rubber stamp. Appellant takes the position that this is tantamount to no signature at all, and briefs the contention as if the indictment had not been signed by the foreman. We cannot agree. The use of a stamp producing a facsimile of an original signature in signing legal documents has been upheld by this court. *Estes v. State*, 484 S.W.2d 711 (Tex.Cr.App.1972); *Parsons v. State*, 429 S.W.2d 476 (Tex.Cr.App.1968); *Ex parte Britton*, 382 S.W.2d 264 (Tex.Cr. App.1964); *Ex parte Spencer*, 171 Tex.Cr.R. 339, 349 S.W.2d 727 (1961); *Stork v. State*, 114 Tex.Cr.R. 398, 23 S.W.2d 733 (Tex.Cr. App.1929). See also *Brooks v. State*, 599 S.W.2d 312, 322–323 (Tex.Cr.App.1979); *Huff v. State*, 560 S.W.2d 652 (Tex.Cr.App.

1978).[1] Since there is nothing in the record which would support a conclusion that the grand jury foreman did not actually place his signature on the indictment or authorize the same to be done, there is no error. Appellant's contention is overruled.

■■■ In a supplemental brief appellant contends the court erred in admitting into evidence the fruits of an unlawful search of her home. Appellant urges the court erred in overruling, after a hearing, her motion to suppress such evidence.

The evidence at said hearing shows that about 3:15 p. m. on April 25, 1973, Houston police officers, an assistant district attorney and a district attorney's investigator went to the Corley Myers home at 3024 Pine Gulley to execute a capias issued for appellant following her indictment. They had been informed Stanley "Snapper" Miles, known to them to be a violent individual, would be on the premises. Several officers had rifles and shotguns. Officer Jerry Carpenter testified he rang the door bell and was admitted by Corley Myers, who allowed the officers to enter. Carpenter found appellant sitting on a couch and informed her that she was under arrest for accomplice to murder and read her *"Miranda"* [2] rights to her. In a search of the immediate area two pistols and a quantity of marihuana were found. Miles was not at the house.

Carpenter transferred appellant to his police vehicle and asked if there were any reasons they could not search her home at 3654 Underwood, and received "No" for an answer. On the way to said address, assistant district attorney Bob Bennett prepared a written form of consent to search which was signed by the appellant. Pursuant thereto a search was conducted at appellant's home resulting in the finding of a blank check with a message written thereon and the other slips of paper discussed previously.

Appellant testified the officers rushed into the Myers house asking "Where's Snapper?"; that Carpenter pointed a rifle at her; that she was not told she was under arrest, and was not given an opportunity to call a lawyer. She related she was handcuffed, placed in a police vehicle and told that they were going to her house to see if Snapper was there. She was not told, she claimed, that she had a right to refuse to consent to a search of her house and didn't think she had such right.

The State acknowledges there was no search warrant, but relies upon written consent to search executed by the appellant.

■■■ It is well settled that when the State relies on a consent to search the burden of proof is on the prosecution to show the clear and convincing evidence that the consent was freely and voluntarily given. *Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *Paprskar v. State*, 484 S.W.2d 731 (Tex.Cr.App.1972); *Kolb v. State*, 532 S.W.2d 87 (Tex.Cr.App. 1976). The prosecution must show the consent given was positive and unequivocal and there must not be duress or coercion, actual or implied. The burden is not discharged if the prosecution does not show more than an acquiescence to a claim of lawful authority. *Allen v. State*, 487 S.W.2d 120 (Tex.Cr.App. 1972). Whether the consent relied upon is a valid one is determined from the totality of the circumstances. See *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Paprskar v. State*, supra.

The appellant acknowledged that she signed the consent form, but claimed it was in a "coercive atmosphere." The record shows the officers had a capias for appellant's arrest that she was informed of the accusation against her, that she was given the *"Miranda"* warnings. Subsequently while on the way to her home with the

---

1. The use of facsimile signatures in widespread and recognized by law. See, e.g., Uniform Facsimile Signatures of Public Officials Act. Article 717j–1, V.A.C.S.

2. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

officers, assistant district attorney Bennett prepared the consent form and read it to the appellant. She then signed it.

It is true that at the time she was under arrest, but that fact does not preclude a free and voluntary consent to search from being given. *Weatherly v. State*, 477 S.W.2d 572 (Tex.Cr.App.1972); *Bennett v. State*, 450 S.W.2d 652 (Tex.Cr.App.1969); *Valerio v. State*, 494 S.W.2d 892 (Tex.Cr. App.1973); *Potts v. State*, 500 S.W.2d 523 (Tex.Cr.App.1973); *Armstrong v. State*, 550 S.W.2d 25, 32 (Tex.Cr.App.1976). And there is no requirement that a person be informed of his right to refuse to consent before consent can be held to be free and voluntary. *DeVoyle v. State*, 471 S.W.2d 77 (Tex.Cr.App.1971); *Armstrong v. State*, supra.

The validity of appellant's consent is a question of fact to be determined from the totality of the circumstances. *Resendez v. State*, 523 S.W.2d 700 (Tex.Cr.App.1975). The trial judge was the trier of the facts, the judge of the credibility of the witnesses and the weight to be given their testimony at the hearing on the motion to suppress evidence. *Heredia v. State*, 528 S.W.2d 847 (Tex.Cr.App.1975); *Ribble v. State*, 503 S.W.2d 551 (Tex.Cr.App.1974). The State's testimony supports the trial judge's conclusion that the consent was freely and voluntarily given. The court was entitled to reject all or any part of appellant's testimony pertaining to the "coercive atmosphere" and the conduct of the officers. *Draper v. State*, 539 S.W.2d 61 (Tex.Cr.App.1976); *Adams v. State*, 537 S.W.2d 746 (Tex.Cr. App.1976). The court did not err in overruling the motion to suppress or in admitting the fruits of the search into evidence.

The State's motion for rehearing is granted; the judgment is affirmed.

ROBERTS, CLINTON and TEAGUE, JJ., dissent.