# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-99-00863-CR

**Roger Dale Newby, Appellant**

**v.**

**The State of Texas, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 147TH JUDICIAL DISTRICT
## NO. 0974135, HONORABLE WILFORD FLOWERS, JUDGE PRESIDING

A jury found appellant Roger Dale Newby guilty of capital murder. *See* Tex. Penal Code Ann. § 19.03(a)(2) (West 1994). Because the State did not seek the death penalty, the district court assessed punishment at imprisonment for life. *See* Tex. Penal Code Ann. § 12.31(a) (West 1994); Tex. Code Crim. Proc. Ann. art. 37.071, § 1 (West Supp. 2001). In his sole point of error, appellant contends his conviction rests on the uncorroborated testimony of an accomplice witness. We will overrule this contention and affirm.

### *Accomplice's Testimony*

The principal witness against appellant was his son, Christopher Newby. Christopher testified that appellant came to Austin in January 1997 and contacted Christopher and his mother, Kathleen Boyd. Christopher had not seen or spoken to appellant during the previous six years.

Christopher began spending a great deal of time with appellant, who lived in motel rooms rented by Christopher under his own name because appellant said he had lost his identification.

Appellant told Christopher that he "wanted to go to bars that were easy to burglarize." To that end, the two men went to the Saloon, a South Austin bar, on March 18, 1997. They stayed at the Saloon for about four hours, "look[ing] around the bar, check[ing] out the security system and see[ing] how things ran." They determined that the bar's change machine was not bolted to the floor. They left the Saloon at 9:00 p.m. and returned to appellant's motel room, where they ate, drank beer, and smoked marihuana. Appellant also made two phone calls, but Christopher did not know to whom the calls were made. They left the motel around 2:30 a.m. on March 19 and returned to the Saloon in Christopher's green Dodge pickup truck.

Christopher parked behind the building, where a man he knew as Hollis, a friend of his father, was waiting in his own truck. Appellant went to speak with Hollis, then returned to Christopher and told him to move the truck closer to the back door of the bar. As Christopher did this, Hollis entered the bar and appellant walked over to a white car, later identified as a 1957 Ford Thunderbird, that was also parked behind the Saloon. Christopher heard "a bang or like kicking the door." He then saw appellant and another man, later identified as Ronald Brooks, walking toward the bar. Brooks was in front of appellant, who was pointing a gun at him. Appellant and Brooks entered the building through the back door. Christopher got out of the truck, picked up two cases of beer that were at the back door of the Saloon, and placed the beer in the bed of his truck. He

heard Brooks tell appellant, "[J]ust leave me alone, I ain't going to tell, I won't say nothing." Hollis then left the building, returned to his truck, and drove away.[1]

At some point, appellant bound Brooks's hands and covered his eyes with duct tape. Appellant ordered Brooks to get into the bed of Christopher's truck. Appellant and Christopher then loaded the Saloon's change machine into the truck beside Brooks and drove away.

Appellant instructed Christopher to drive to a wooded area "so we can tie him up so he wouldn't be able to call the cops on us." Christopher drove to a nearby greenbelt. When they arrived, they discovered that Brooks had removed the duct tape covering his eyes. Christopher said, "Before I could do anything, he was shot." Appellant shot Brooks in the head with a .38 caliber pistol that he had taken from Christopher's grandfather's house. Appellant told Christopher, "[I]t's all right, I will take care of everything, don't worry." The two men pulled Brooks's body from the truck, dragged it a short distance from the truck, and covered it with brush. They then drove to a car wash to clean the blood from the truck. One of the cases of beer had blood on it, so they removed the beer and disposed of the cardboard box. From the car wash, they drove to appellant's motel room, where they unloaded the beer and the change machine.

Christopher went to work, but returned to the motel later that day. He and appellant reloaded the change machine into Christopher's truck and took it to a remote location near Lake Travis. There, the men used a sledge hammer and crowbar to break into the machine. After removing the money from the machine, they covered it with trash that had been discarded nearby.

---

[1] A police officer testified that Hollis was later identified as Zachary Bacon. Bacon was interviewed by the police, and his involvement in these events was still being investigated at the time of appellant's trial. The officer testified that there was no evidence linking Bacon to Brook's murder.

3

They returned to Austin, where appellant checked into a new motel. The next day, Christopher and appellant took Christopher's truck to the dealer for service. They were given a Dodge Stratus to drive while the truck was in the shop.

It is undisputed that appellant's conviction cannot be sustained without Christopher's testimony. It is also undisputed that Christopher was an accomplice to the capital murder of Ronald Brooks. A conviction cannot be based on the testimony of an accomplice unless that testimony is corroborated by other evidence tending to connect the defendant to the offense. Tex. Code Crim. Proc. Ann. art. 38.14 (West 1979). The corroboration is not sufficient if it merely shows the commission of the offense. *Id*.

### Other Evidence

The burglary at the Saloon was discovered around 6:00 a.m. on March 19 by Sergio Soto, an employee. After entering the bar through the front door, Soto noticed that papers had been strewn about the office, the cooler was open, and the change machine was missing. Soto went out the back door, which was ajar, to look for Brooks. Soto explained that Brooks, a regular patron of the Saloon, slept in his 1957 Thunderbird which he left parked behind the building. Brooks was not in his car, but Soto saw his glasses and cigarettes. Soto called the police and the bar's manager, Delia Cornell. Cornell confirmed the fact of the burglary and that the change machine had been stolen. She was unable to state with assurance whether any beer had been taken.

Investigating officers testified that the passenger window of Brooks's car had been shattered, apparently from the outside, then pried open. A muddy shoeprint was found on the car,

4

but was never identified. Because Brooks's personal items were still in the car, the officers feared he had been kidnapped.

Brooks's body was discovered at 1:15 p.m. on March 19. He had been killed by a single gunshot to the head. Drag marks on the ground and on the body suggested that the body had been moved. Numerous shoeprints were found around the body, but the area was a hike-and-bike trail and none of these shoeprints was connected to the offense. There was duct tape on Brooks's face and wrists, but forensic experts were unable to link this tape to a roll of duct tape later found in Christopher's truck.

On the afternoon of March 20, Austin police officers were dispatched to a stalled vehicle on Brodie Lane. Officer Steve Dominguez testified that the vehicle was a Dodge Stratus occupied by Christopher Newby. Dominguez pushed the Stratus into a nearby parking lot. A check disclosed three outstanding warrants for Christopher's arrest. When Dominguez told him he was under arrest, Christopher fled into an undeveloped field, where he hid in the brush and trees. He was found with the assistance of a police dog and arrested.

Officer Michael Joyner waited with the Stratus and the police vehicles while Dominguez pursued Christopher. As he waited, a car pulled up and a man Joyner identified as appellant got out with a can of gasoline. Appellant, who had no identification but said his name was Lewis Sprayberry, told the officer that he was visiting Austin from the Fort Worth area.[2] He explained that the Stratus was being driven by his nephew when it ran out of gas, and appellant had

---

[2] Sprayberry was in fact appellant's half-brother.

5

walked to a nearby service station. Appellant said he did not know why his nephew had fled from the officers.

After Christopher was arrested, and before the Stratus was impounded by the police, appellant asked Joyner if he could get his clothing from the trunk. Joyner opened the trunk, in which he saw several pairs of jeans and shirts. He also noticed a cardboard case of beer. It was not the type commonly found at retailers, but "was an extremely heavy, reusable-type case with kind of a wax covering." There was testimony that the container was the sort used by distributors to deliver beer to the Saloon and other bars. Joyner took the clothes from the trunk of the Stratus and, after making sure they did not contain contraband, gave them to appellant. Appellant then left on foot.

Joyner testified that during his conversation with appellant, "I could tell he was somewhat nervous. He was somewhat evasive in his [answers]. Again, I just had that feeling. I don't know what to base it on, but I was not getting the truth from this individual. I tried every way I know how to disprove what he told me, but I couldn't at the scene. I had no alternative but to let him go."

Christopher called his mother, Boyd, from jail following his arrest and asked her to find appellant. Boyd located appellant at his motel and asked him why Christopher was in jail. "I knew it had to do with burglaries. That is all I knew at the time. [Appellant] said that he had everything under control . . . had contacted a lawyer in Dallas and that he was going back to Dallas . . . go to his lawyer's office and his lawyer and him were going to go to the police station, that he was going to turn himself in, admit to the burglaries . . . ." Appellant then told Boyd that "he had some stuff that he couldn't take on the bus with him, and he proceeded to give me the bag [of

6

clothes] and some guns." Appellant gave Boyd a rifle, shotgun, and two handguns. Appellant told her that one of the handguns had belonged to her stepfather, Christopher's grandfather. Boyd asked appellant how he came to have the pistol, but he told her "don't worry about it, just take the guns." Boyd took the firearms to her rented storage unit for safekeeping.

Boyd refused to give appellant a ride to the bus station. Appellant called Roger Fuller, a friend of Christopher. Appellant told Fuller that Christopher was in jail and that he, appellant, needed to get out of town. Fuller agreed to take appellant to the bus station. Appellant said that he was going to a motel in Euless.

Christopher remained in jail on charges unrelated to the instant offense. On April 28, 1997, while being questioned about another crime, Christopher made statements regarding his involvement in the burglary at the Saloon and the murder of Brooks. At his request, police officers took Christopher to his mother's house to speak to her. Boyd, Christopher, and the police then went to Boyd's storage unit where she turned over to the police the .38 caliber pistol that had belonged to her stepfather and that appellant had given her to keep one month earlier. Later that day, Christopher took the police to the location near Lake Travis where the change machine taken from the Saloon had been discarded. A streak of green paint on the machine appeared to match the color of Christopher's truck.

The State's firearms expert examined the fragmented and deformed bullet recovered from Brooks's body at autopsy and concluded that "it would have to be a .38 caliber bullet or larger." The expert compared the fatal bullet to a test bullet fired from the .38 caliber pistol obtained from Boyd. He testified, "The land and groove widths and the number of lands and grooves and the twist

are the same as found on the test bullets fired from this revolver; however — which allows me to conclude that it could have been fired from this firearm; however, there are too few matching scratches for me to rule out every other gun." No latent fingerprints were found on the pistol. Although a presumptive test for blood was positive, subsequent laboratory tests found no blood on the weapon.

Austin police found appellant in June 1997 in Lewisville, where he had been arrested for burglary. Appellant admitted to the police that he was in the Dodge Stratus with Christopher on the afternoon Christopher was arrested. He also admitted having been in the Saloon, but he denied any involvement in the burglary and murder. Other witnesses testified that they saw appellant in the Saloon on the night of the crime with another, younger man. One of these witnesses testified that she saw appellant having a conversation with Brooks.

William Chalmers testified that he met Christopher Newby in jail. Christopher told Chalmers he was in jail for murder. Christopher dictated a letter to Chalmers and asked him to deliver it to appellant. In the letter, Christopher told appellant that he planned to testify against him at trial in exchange for immunity, but would later recant his testimony on appeal so that appellant's conviction would be reversed. Chalmers never delivered the letter to appellant, but did tell appellant, "Chris told me to give you a letter, and I told him what some of the things the letter had said." Chalmers described appellant's reply: "Well, first he said I don't know what he is talking about, and then he said what is he doing telling our business."

*Sufficiency of Corroboration*

To test the sufficiency of the corroboration of an accomplice witness, we ignore the accomplice's testimony and determine whether the remaining evidence tends to connect the accused with commission of the crime. *Walker v. State*, 615 S.W.2d 728, 731-32 (Tex. Crim. App. 1981). We view the corroborating evidence in the light most favorable to the verdict. *Gill v. State*, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994); *Utsey v. State*, 921 S.W.2d 451, 453 (Tex. App.—Texarkana 1996, pet. ref'd). The accomplice witness's testimony need not be entirely corroborated, nor need the corroboration directly link the accused to the crime or be sufficient in itself to establish guilt. *Hernandez v. State*, 939 S.W.2d 173, 176 (Tex. Crim. App. 1997); *Gill*, 873 S.W.2d at 48. The corroboration is sufficient if the cumulative weight of all the independent facts and circumstances tends to connect the defendant to the offense. *Hernandez*, 939 S.W.2d at 176; *Reed v. State*, 744 S.W.2d 112, 126 (Tex. Crim. App. 1988). Apparently insignificant circumstances may sometimes provide the necessary corroboration. *Paulus v. State*, 633 S.W.2d 827, 844 (Tex. Crim. App. 1981) (dissenting op. adopted on reh'g).

We conclude that the following facts and circumstances, considered together, tend to connect appellant to the burglary at the Saloon and murder of Brooks:

- Two witnesses testified they saw appellant in the Saloon on the night of the offense with a younger man. One of these witnesses said appellant was talking to Brooks, the murder victim. While appellant's mere presence at the scene of the crime is insufficient in itself to corroborate the accomplice's testimony, such evidence may tend to connect the accused to the offense when

coupled with other suspicious circumstances. *Trevino v. State*, 991 S.W.2d 849, 851-52 (Tex. Crim. App. 1999).

- Appellant was with the accomplice on the day after the murder. The presence of the accused with the accomplice witness may be corroborative when coupled with other circumstances. *Paulus*, 633 S.W.2d at 846. A police officer testified that appellant appeared nervous and evasive, and he gave a false name when asked to identify himself. A case of beer in a container of the sort used to deliver beer to bars was in the trunk of the car occupied by appellant and the accomplice, although it was never clearly established that beer was taken from the Saloon during the burglary.

- When confronted by Boyd following Christopher's arrest, appellant told her that "he had everything under control" and "was going to turn himself in, admit to the burglaries" after consulting his lawyer in Dallas.

- Appellant left Austin on the day after the murder, telling the man who took him to the bus station that he "needed to get out of town." Before leaving Austin, appellant gave Boyd several weapons, including a .38 pistol that an expert testified could have fired the fatal bullet. Because of the condition of the bullet, a positive match was impossible.

- When told by a fellow inmate that Christopher had made statements regarding the murder, appellant said, "[W]hat is he doing telling our business."

10

While these facts and circumstances are not sufficient in themselves to establish appellant's guilt, they collectively tend to link appellant to the offense and therefore satisfy the accomplice witness statute.

We have considered the two opinions on which appellant chiefly relies. The facts in *Badillo v. State*, 963 S.W.2d 854, 855-56 (Tex. App.—San Antonio 1998, pet. ref'd), are similar to those in the cause before us. There, as here, the accomplices implicated the defendant in a robbery-murder and took the police to the place where the stolen cash register had been dumped. But the only corroborative evidence was that the defendant had been seen near the store on the afternoon of the offense. Similarly, in *Meyers v. State*, 626 S.W.2d 778, 781 (Tex. Crim. App. 1982), the only corroborative fact placed the defendant near the scene of the crime one-half hour before it was committed. In neither of these cases were there additional circumstances tending to connect the defendant to the offense, as there are in this cause.

The point of error is overruled and the judgment of conviction is affirmed.

_____

Jan P. Patterson, Justice

Before Chief Justice Aboussie, Justices B. A. Smith and Patterson

Affirmed

Filed:   February 8, 2001

Do Not Publish