TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-99-00863-CR







Roger Dale Newby, Appellant



v.



The State of Texas, Appellee






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 147TH JUDICIAL DISTRICT


NO. 0974135, HONORABLE WILFORD FLOWERS, JUDGE PRESIDING







A jury found appellant Roger Dale Newby guilty of capital murder. See Tex. Penal
Code Ann. § 19.03(a)(2) (West 1994). Because the State did not seek the death penalty, the
district court assessed punishment at imprisonment for life. See Tex. Penal Code Ann. § 12.31(a)
(West 1994); Tex. Code Crim. Proc. Ann. art. 37.071, § 1 (West Supp. 2001). In his sole point
of error, appellant contends his conviction rests on the uncorroborated testimony of an accomplice
witness. We will overrule this contention and affirm.


Accomplice's Testimony

The principal witness against appellant was his son, Christopher Newby. 
Christopher testified that appellant came to Austin in January 1997 and contacted Christopher and
his mother, Kathleen Boyd. Christopher had not seen or spoken to appellant during the previous
six years. Christopher began spending a great deal of time with appellant, who lived in motel
rooms rented by Christopher under his own name because appellant said he had lost his
identification.

Appellant told Christopher that he "wanted to go to bars that were easy to
burglarize." To that end, the two men went to the Saloon, a South Austin bar, on March 18,
1997. They stayed at the Saloon for about four hours, "look[ing] around the bar, check[ing] out
the security system and see[ing] how things ran." They determined that the bar's change machine
was not bolted to the floor. They left the Saloon at 9:00 p.m. and returned to appellant's motel
room, where they ate, drank beer, and smoked marihuana. Appellant also made two phone calls,
but Christopher did not know to whom the calls were made. They left the motel around 2:30 a.m.
on March 19 and returned to the Saloon in Christopher's green Dodge pickup truck. 

Christopher parked behind the building, where a man he knew as Hollis, a friend
of his father, was waiting in his own truck. Appellant went to speak with Hollis, then returned
to Christopher and told him to move the truck closer to the back door of the bar. As Christopher
did this, Hollis entered the bar and appellant walked over to a white car, later identified as a 1957
Ford Thunderbird, that was also parked behind the Saloon. Christopher heard "a bang or like
kicking the door." He then saw appellant and another man, later identified as Ronald Brooks,
walking toward the bar. Brooks was in front of appellant, who was pointing a gun at him. 
Appellant and Brooks entered the building through the back door. Christopher got out of the
truck, picked up two cases of beer that were at the back door of the Saloon, and placed the beer
in the bed of his truck. He heard Brooks tell appellant, "[J]ust leave me alone, I ain't going to tell,
I won't say nothing." Hollis then left the building, returned to his truck, and drove away.(1)

At some point, appellant bound Brooks's hands and covered his eyes with duct tape. 
Appellant ordered Brooks to get into the bed of Christopher's truck. Appellant and Christopher
then loaded the Saloon's change machine into the truck beside Brooks and drove away.

Appellant instructed Christopher to drive to a wooded area "so we can tie him up
so he wouldn't be able to call the cops on us." Christopher drove to a nearby greenbelt. When
they arrived, they discovered that Brooks had removed the duct tape covering his eyes. 
Christopher said, "Before I could do anything, he was shot." Appellant shot Brooks in the head
with a .38 caliber pistol that he had taken from Christopher's grandfather's house. Appellant told
Christopher, "[I]t's all right, I will take care of everything, don't worry." The two men pulled
Brooks's body from the truck, dragged it a short distance from the truck, and covered it with
brush. They then drove to a car wash to clean the blood from the truck. One of the cases of beer
had blood on it, so they removed the beer and disposed of the cardboard box. From the car wash,
they drove to appellant's motel room, where they unloaded the beer and the change machine.

Christopher went to work, but returned to the motel later that day. He and
appellant reloaded the change machine into Christopher's truck and took it to a remote location
near Lake Travis. There, the men used a sledge hammer and crowbar to break into the machine. 
After removing the money from the machine, they covered it with trash that had been discarded
nearby. They returned to Austin, where appellant checked into a new motel. The next day,
Christopher and appellant took Christopher's truck to the dealer for service. They were given a
Dodge Stratus to drive while the truck was in the shop.

It is undisputed that appellant's conviction cannot be sustained without
Christopher's testimony. It is also undisputed that Christopher was an accomplice to the capital
murder of Ronald Brooks. A conviction cannot be based on the testimony of an accomplice unless
that testimony is corroborated by other evidence tending to connect the defendant to the offense. 
Tex. Code Crim. Proc. Ann. art. 38.14 (West 1979). The corroboration is not sufficient if it
merely shows the commission of the offense. Id. 


Other Evidence

The burglary at the Saloon was discovered around 6:00 a.m. on March 19 by Sergio
Soto, an employee. After entering the bar through the front door, Soto noticed that papers had
been strewn about the office, the cooler was open, and the change machine was missing. Soto
went out the back door, which was ajar, to look for Brooks. Soto explained that Brooks, a regular
patron of the Saloon, slept in his 1957 Thunderbird which he left parked behind the building. 
Brooks was not in his car, but Soto saw his glasses and cigarettes. Soto called the police and the
bar's manager, Delia Cornell. Cornell confirmed the fact of the burglary and that the change
machine had been stolen. She was unable to state with assurance whether any beer had been
taken.

Investigating officers testified that the passenger window of Brooks's car had been
shattered, apparently from the outside, then pried open. A muddy shoeprint was found on the car,
but was never identified. Because Brooks's personal items were still in the car, the officers feared
he had been kidnapped.

Brooks's body was discovered at 1:15 p.m. on March 19. He had been killed by
a single gunshot to the head. Drag marks on the ground and on the body suggested that the body
had been moved. Numerous shoeprints were found around the body, but the area was a hike-and-bike trail and none of these shoeprints was connected to the offense. There was duct tape on
Brooks's face and wrists, but forensic experts were unable to link this tape to a roll of duct tape
later found in Christopher's truck. 

On the afternoon of March 20, Austin police officers were dispatched to a stalled
vehicle on Brodie Lane. Officer Steve Dominguez testified that the vehicle was a Dodge Stratus
occupied by Christopher Newby. Dominguez pushed the Stratus into a nearby parking lot. A
check disclosed three outstanding warrants for Christopher's arrest. When Dominguez told him
he was under arrest, Christopher fled into an undeveloped field, where he hid in the brush and
trees. He was found with the assistance of a police dog and arrested.

Officer Michael Joyner waited with the Stratus and the police vehicles while
Dominguez pursued Christopher. As he waited, a car pulled up and a man Joyner identified as
appellant got out with a can of gasoline. Appellant, who had no identification but said his name
was Lewis Sprayberry, told the officer that he was visiting Austin from the Fort Worth area.(2) He
explained that the Stratus was being driven by his nephew when it ran out of gas, and appellant
had walked to a nearby service station. Appellant said he did not know why his nephew had fled
from the officers. 

After Christopher was arrested, and before the Stratus was impounded by the
police, appellant asked Joyner if he could get his clothing from the trunk. Joyner opened the
trunk, in which he saw several pairs of jeans and shirts. He also noticed a cardboard case of beer. 
It was not the type commonly found at retailers, but "was an extremely heavy, reusable-type case
with kind of a wax covering." There was testimony that the container was the sort used by
distributors to deliver beer to the Saloon and other bars. Joyner took the clothes from the trunk
of the Stratus and, after making sure they did not contain contraband, gave them to appellant. 
Appellant then left on foot.

Joyner testified that during his conversation with appellant, "I could tell he was
somewhat nervous. He was somewhat evasive in his [answers]. Again, I just had that feeling. 
I don't know what to base it on, but I was not getting the truth from this individual. I tried every
way I know how to disprove what he told me, but I couldn't at the scene. I had no alternative but
to let him go." 

Christopher called his mother, Boyd, from jail following his arrest and asked her
to find appellant. Boyd located appellant at his motel and asked him why Christopher was in jail. 
"I knew it had to do with burglaries. That is all I knew at the time. [Appellant] said that he had
everything under control . . . had contacted a lawyer in Dallas and that he was going back to
Dallas . . . go to his lawyer's office and his lawyer and him were going to go to the police station,
that he was going to turn himself in, admit to the burglaries . . . ." Appellant then told Boyd that
"he had some stuff that he couldn't take on the bus with him, and he proceeded to give me the bag
[of clothes] and some guns." Appellant gave Boyd a rifle, shotgun, and two handguns. Appellant
told her that one of the handguns had belonged to her stepfather, Christopher's grandfather. Boyd
asked appellant how he came to have the pistol, but he told her "don't worry about it, just take the
guns." Boyd took the firearms to her rented storage unit for safekeeping.

Boyd refused to give appellant a ride to the bus station. Appellant called Roger
Fuller, a friend of Christopher. Appellant told Fuller that Christopher was in jail and that he,
appellant, needed to get out of town. Fuller agreed to take appellant to the bus station. Appellant
said that he was going to a motel in Euless. 

Christopher remained in jail on charges unrelated to the instant offense. On April
28, 1997, while being questioned about another crime, Christopher made statements regarding his
involvement in the burglary at the Saloon and the murder of Brooks. At his request, police
officers took Christopher to his mother's house to speak to her. Boyd, Christopher, and the police
then went to Boyd's storage unit where she turned over to the police the .38 caliber pistol that had
belonged to her stepfather and that appellant had given her to keep one month earlier. Later that
day, Christopher took the police to the location near Lake Travis where the change machine taken
from the Saloon had been discarded. A streak of green paint on the machine appeared to match
the color of Christopher's truck.

The State's firearms expert examined the fragmented and deformed bullet recovered
from Brooks's body at autopsy and concluded that "it would have to be a .38 caliber bullet or
larger." The expert compared the fatal bullet to a test bullet fired from the .38 caliber pistol
obtained from Boyd. He testified, "The land and groove widths and the number of lands and
grooves and the twist are the same as found on the test bullets fired from this revolver; however
-- which allows me to conclude that it could have been fired from this firearm; however, there are
too few matching scratches for me to rule out every other gun." No latent fingerprints were found
on the pistol. Although a presumptive test for blood was positive, subsequent laboratory tests
found no blood on the weapon.

Austin police found appellant in June 1997 in Lewisville, where he had been
arrested for burglary. Appellant admitted to the police that he was in the Dodge Stratus with
Christopher on the afternoon Christopher was arrested. He also admitted having been in the
Saloon, but he denied any involvement in the burglary and murder. Other witnesses testified that
they saw appellant in the Saloon on the night of the crime with another, younger man. One of
these witnesses testified that she saw appellant having a conversation with Brooks.

William Chalmers testified that he met Christopher Newby in jail. Christopher told
Chalmers he was in jail for murder. Christopher dictated a letter to Chalmers and asked him to
deliver it to appellant. In the letter, Christopher told appellant that he planned to testify against
him at trial in exchange for immunity, but would later recant his testimony on appeal so that
appellant's conviction would be reversed. Chalmers never delivered the letter to appellant, but
did tell appellant, "Chris told me to give you a letter, and I told him what some of the things the
letter had said." Chalmers described appellant's reply: "Well, first he said I don't know what he
is talking about, and then he said what is he doing telling our business."

Sufficiency of Corroboration

To test the sufficiency of the corroboration of an accomplice witness, we ignore the
accomplice's testimony and determine whether the remaining evidence tends to connect the
accused with commission of the crime. Walker v. State, 615 S.W.2d 728, 731-32 (Tex. Crim.
App. 1981). We view the corroborating evidence in the light most favorable to the verdict. Gill
v. State, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994); Utsey v. State, 921 S.W.2d 451, 453 (Tex.
App.--Texarkana 1996, pet. ref'd). The accomplice witness's testimony need not be entirely
corroborated, nor need the corroboration directly link the accused to the crime or be sufficient in
itself to establish guilt. Hernandez v. State, 939 S.W.2d 173, 176 (Tex. Crim. App. 1997); Gill,
873 S.W.2d at 48. The corroboration is sufficient if the cumulative weight of all the independent
facts and circumstances tends to connect the defendant to the offense. Hernandez, 939 S.W.2d
at 176; Reed v. State, 744 S.W.2d 112, 126 (Tex. Crim. App. 1988). Apparently insignificant
circumstances may sometimes provide the necessary corroboration. Paulus v. State, 633 S.W.2d 
827, 844 (Tex. Crim. App. 1981) (dissenting op. adopted on reh'g).

We conclude that the following facts and circumstances, considered together, tend
to connect appellant to the burglary at the Saloon and murder of Brooks:


 Two witnesses testified they saw appellant in the Saloon on the night of the
offense with a younger man. One of these witnesses said appellant was
talking to Brooks, the murder victim. While appellant's mere presence at
the scene of the crime is insufficient in itself to corroborate the
accomplice's testimony, such evidence may tend to connect the accused to
the offense when coupled with other suspicious circumstances. Trevino v.
State, 991 S.W.2d 849, 851-52 (Tex. Crim. App. 1999). 
 Appellant was with the accomplice on the day after the murder. The
presence of the accused with the accomplice witness may be corroborative
when coupled with other circumstances. Paulus, 633 S.W.2d at 846. A
police officer testified that appellant appeared nervous and evasive, and he
gave a false name when asked to identify himself. A case of beer in a
container of the sort used to deliver beer to bars was in the trunk of the car
occupied by appellant and the accomplice, although it was never clearly
established that beer was taken from the Saloon during the burglary.
 When confronted by Boyd following Christopher's arrest, appellant told her
that "he had everything under control" and "was going to turn himself in,
admit to the burglaries" after consulting his lawyer in Dallas. 
 Appellant left Austin on the day after the murder, telling the man who took
him to the bus station that he "needed to get out of town." Before leaving
Austin, appellant gave Boyd several weapons, including a .38 pistol that an
expert testified could have fired the fatal bullet. Because of the condition
of the bullet, a positive match was impossible.
 When told by a fellow inmate that Christopher had made statements
regarding the murder, appellant said, "[W]hat is he doing telling our
business."


While these facts and circumstances are not sufficient in themselves to establish appellant's guilt,
they collectively tend to link appellant to the offense and therefore satisfy the accomplice witness
statute. 

We have considered the two opinions on which appellant chiefly relies. The facts
in Badillo v. State, 963 S.W.2d 854, 855-56 (Tex. App.--San Antonio 1998, pet. ref'd), are
similar to those in the cause before us. There, as here, the accomplices implicated the defendant
in a robbery-murder and took the police to the place where the stolen cash register had been
dumped. But the only corroborative evidence was that the defendant had been seen near the store
on the afternoon of the offense. Similarly, in Meyers v. State, 626 S.W.2d 778, 781 (Tex. Crim.
App. 1982), the only corroborative fact placed the defendant near the scene of the crime one-half
hour before it was committed. In neither of these cases were there additional circumstances
tending to connect the defendant to the offense, as there are in this cause.

The point of error is overruled and the judgment of conviction is affirmed.



 __________________________________________

 Jan P. Patterson, Justice

Before Chief Justice Aboussie, Justices B. A. Smith and Patterson

Affirmed

Filed: February 8, 2001

Do Not Publish

1. A police officer testified that Hollis was later identified as Zachary Bacon. Bacon was
interviewed by the police, and his involvement in these events was still being investigated at the
time of appellant's trial. The officer testified that there was no evidence linking Bacon to Brook's
murder.
2. Sprayberry was in fact appellant's half-brother. 


State, 615 S.W.2d 728, 731-32 (Tex. Crim.
App. 1981). We view the corroborating evidence in the light most favorable to the verdict. Gill
v. State, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994); Utsey v. State, 921 S.W.2d 451, 453 (Tex.
App.--Texarkana 1996, pet. ref'd). The accomplice witness's testimony need not be entirely
corroborated, nor need the corroboration directly link the accused to the crime or be sufficient in
itself to establish guilt. Hernandez v. State, 939 S.W.2d 173, 176 (Tex. Crim. App. 1997); Gill,
873 S.W.2d at 48. The corroboration is sufficient if the cumulative weight of all the independent
facts and circumstances tends to connect the defendant to the offense. Hernandez, 939 S.W.2d
at 176; Reed v. State, 744 S.W.2d 112, 126 (Tex. Crim. App. 1988). Apparently insignificant
circumstances may sometimes provide the necessary corroboration. Paulus v. State, 633 S.W.2d 
827, 844 (Tex. Crim. App. 1981) (dissenting op. adopted on reh'g).

We conclude that the following facts and circumstances, considered together, tend
to connect appellant to the burglary at the Saloon and murder of Brooks:


 Two witnesses testified they saw appellant in the Saloon on the night of the
offense with a younger man. One of these witnesses said appellant was
talking to Brooks, the murder victim. While appellant's mere presence at
the scene of the crime is insufficient in itself to corroborate the
accomplice's testimony, such evidence may tend to connect the accused to
the offense when coupled with other suspicious circumstances. Trevino v.
State, 991 S.W.2d 849, 851-52 (Tex. Crim. App. 1999). 
 Appellant was with the accomplice on the day after the murder. The
presence of the accused with the accomplice witness may be corroborative
when coupled with other circumstances. Paulus, 633 S.W.2d at 846. A
police officer testified that appellant appeared nervous and evasive, and he
gave a false name when asked to identify himself. A case of beer in a
container of the sort used to deliver beer to bars was in the trunk of the car
occupied by appellant and the accomplice, although it was never clearly
established that beer was taken from the Saloon during the burglary.
 When confronted by Boyd following Christopher's arrest, appellant told her
that "he had everything under control" and "was going to turn himself in,
admit to the burglaries" after consulting his lawyer in Dallas. 
 Appellant left Austin on the day after the murder, telling the man who took
him to the bus station that he "needed to get out of town." Before leaving
Austin, appellant gave Boyd several weapons, including a .38 pistol that an
expert testified could have fired the fatal bullet. Because of the condition
of the bullet, a positive match was impossible.
 When told by a fellow inmate that Christopher had made statements
regarding the murder, appellant said, "[W]hat is he doing telling our
business."


While these facts and circumstances are not sufficient in themselves to establish appellant's guilt,
they collectively tend to link appellant to the offense and therefore satisfy the accomplice witness
statute. 

We have considered the two opinions on which appellant chiefly relies. The facts
in Badillo v. State, 963 S.W.2d 854, 855-56 (Tex. App.--San Antonio 1998, pet. ref'd), are
similar to those in the cause before us. There, as here, the accomplices implicated the defendant
in a robbery-murder and took the police to the place where the stolen cash register had been
dumped. But the only corroborative evidence was that the defendant had been seen near the store
on the afternoon of the offense. Similarly, in Meyers v. State, 626 S.W.2d 778, 781 (Tex. Crim.
App. 1982), the only corroborative fact placed the defendant near the scene of the crime one-half
hour before it was committed. In neither of these cases were there additional circumstances
tending to connect the defendant to the offense, as there are in this cause.

The point of error is overruled and the judgment of conviction is affirmed.



 __________________________________________

 Jan P. Patterson, Justice

Before Chief Justice Aboussie, Justices B. A. Smith and Patterson

Affirmed

Filed: February 8, 2001

Do Not Publish

1. A police officer testified that Hollis was later identified as Zachary Bacon. Bacon was
interviewed by the police, and his involvement in these events was still being investigated at the
time of appellant's trial. The officer testified that there was no evidence linking Bacon to Brook's
murder.
2. Sprayberry was in fact appellant's half-brother.